## DONALDSON v. ROKSAMENT STONE CO.

(Circuit Court, E. D. New York. April 29, 1909.)

PATENTS (§ 328*)—INFRINGEMENT—PROCESS OF MAKING ARTIFICIAL STONE.

The Stevens patent, No. 624,563, for an improved process of forming artificial stone, the principal feature of which is the use in the mold of relatively dry sand to extract the moisture from the plastic stone compound from which the blocks are cast, was not anticipated, and discloses invention, the process being novel and one of a high degree of merit. Also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

O. Ellery Edwards, Jr. (R. A. Parker, of counsel), for complainant.

Heyn & Covington (George B. Covington, of counsel), for defendant.

CHATFIELD, District Judge. The complainant has acquired, by various assignments which need not be stated other than generally, the right, within certain territorial limits, to use, and to protect by the prosecution of infringers, certain patent rights originally obtained by one Charles W. Stevens, under date of May 9, 1899, No. 624,563, application filed November 12, 1897, and, as stated by him, the invention related to improvements in processes of making artificial stone, and particularly to that class exemplified by letters patent No. 583,515, granted June 1, 1897, to Charles W. Stevens. Stevens assigned his rights to an Illinois corporation, the Stevens Stone Company, and territorial rights were granted through this corporation to Stevens, then to the American Stone Company, a New Jersey corporation, then to the New York Cement Stone Company, by whom certain similar rights were granted to Edward R. Diggs, who in turn granted to John Donaldson, the complainant, the use of the patent in the territory, including the place where the alleged infringing acts of the defendant, at the defendant's factory, are charged to have been committed. The complainant has also shown other grants covering the entire Eastern district of New York, and the various documents seem to convey a prima facie title, which has not been controverted in this action.

The general purpose of the patent, and some discussion of the material thereby produced, must be had at the outset, in order to understand the issues and testimony in the case. Natural stone has been used as a building material, and has been known as a material object, since a period of which no record of such use exists. In a similar

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

way, the substance now called "concrete" has been used for centuries, and the terms "cement" and "mortar" need no explanation, except as a convenient method of distinguishing their use and construction. The following text-book definitions may therefore save confusion in the succeeding statement and argument:

"Cement. Portland cement is the slow-setting product of a high-temperature kiln burning a pulverized cement rock, or mixture of clay and limestone of a very exact and regular composition."

"Natural cement is the quick-setting product of a low-temperature kiln burning a cement rock of irregular composition."

(Dr. C. F. McKenna, defendant's expert.)

"Sand. This material, which forms one of the ingredients of mortar, is the granular product arising from the disintegration of rocks."

(Mahan's Civil Engineering.)

"Mortar. Is any mixture of lime in paste with sand. It may be divided into two principal classes: Hydraulic mortar, which is made of hydraulic lime, and common mortar, made of common lime."

"The term 'grout' is applied to any mortar in a thin or fluid state; and the terms 'concrete' and 'beton' to mortars incorporated with gravel and small fragments of stone or brick."

(Mahan's Civil Engineering.)

"Concrete. Consists of mortar in which is embedded small pieces of some hard material. The mortar is often referred to as the matrix, and the embedded fragments as the aggregate. Concrete is a species of artificial stone. It is often called beton, the French equivalent for concrete."

And again:

"The term 'concrete' is almost universally understood to be cement mortar, with pebbles or broken stone imbedded in it."

(Masonry Construction, by Baker.)

The difference between grout and concrete is stated, by the text-books above referred to, to consist in the fact that grout is fluid enough, or prepared in such plastic condition as to flow readily, and thus may be employed in filling in cracks and apertures, where a more solid or resistant material, like concrete, could not be made to enter all parts of the opening, and where even tamping would not accomplish the desired object, if the space would allow that method of distributing the substance itself.

Concrete in some forms has been shown to have had great durability and has stood the test of the elements, and of wear from the time of the Romans to the present date. The Pantheon is stated to be a building of concrete, and stands, in even more durable form, as the years go by. But such structures of concrete do not present an attractive appearance, and are not capable of ornamentation. They are not artificial stone, in the sense of possessing the same qualities which would be present in natural stone, but in durability and hardness they are much like the substance produced under the patent in suit, and this likewise has resulted in the adoption of the trade-names of "Litholite" or "Roman Stone," which are used by the complainant in his advertising matter, and which have been common enough to designate a certain character of building material, the process of making which is exactly defined in the Stevens patent above referred to.

The complainant has introduced in evidence many examples, both in the way of pictures and samples, of the value, practicability, and

extreme adaptability of this material for building purposes. He has also proven its use in many structures where durability, capacity for ornamentation in the way of carving, and attractive appearance have been desired. The complainant has also furnished a striking illustration, as evidence of the durability of the stone, in a power house at Niagara Falls, where the mist of the falls, freezing during the winter months, has caused disintegration of buildings composed of natural stone, while buildings composed of complainant's material have become harder and more substantial with the continued exposure.

These illustrations are all that is necessary upon the questions of adaptability and value, and there is little contention made by the defendant as to infringement. The defendant has, it is true, produced some witnesses who have not had successful results when attempting to work under a license from the complainant, but these instances would seem to be failures in carrying out the method, rather than in the method itself, and the success of the complainant's own work more than overcomes the doubt suggested by the defendant's witnesses. And, in the same way, testimony to the effect that the defendant is not infringing is of slight weight in comparison with the testimony showing the use of a similar process by the defendant at its factory near the Gowanus Canal, in Brooklyn.

The question of anticipation, however, and of unpatentability, in that the idea is claimed to be no more than an old and well-known method in various arts, brings up more difficult issues, and requires a somewhat careful delineation of the method itself, and of the processes of other patents, as well as the general principles of molding in all kinds of trades and arts. The defendant has cited a number of patents, among them letters patent to Hunt, No. 54,910, May 22, 1866; Quinby, No. 240,459, April 19, 1881; Sellars, No. 244,321, July 12, 1881; Hoyt, No. 368,398, August 16, 1887; Stevens, No. 457,231, August 4, 1891; Stevens, No. 583,515, June 1, 1897; as well as English patents to Hind, No. 2,280, October 6, 1859; McLean, No. 8,747, June 9, 1884; McLean, No. 1,262, December 28, 1889; Parker, No. 4,881, March 20, 1890—showing the application of the principle of casting in a mold, with fluid, whether mineral or metal, and of allowing the molten or fluid material to cool and harden or set, as is commonly known in the casting of iron and in the making of objects with plaster of paris, or even of filling in the spaces between material with mortar, which sets through the action of the cement or lime, in hardening, both by evaporation and by chemical action.

But the patent under discussion, as described by Stevens, depends upon another well-known and fundamental principle, which adds to the chemical and evaporating action of cement or mortar, namely, that of drainage and solidification by settling and capillary attraction, rather than by internal contraction, such as occurs with evaporation. The Stevens patent when first presented to the Patent Office was rejected in so far as its claims described merely a molding, such as was known and used with all kinds of material; but when Stevens added to his claims the language with relation to the drainage and concentration thereby obtained, the patent was granted, and the claims in their present form allowed.

The language used by Stevens, in its final form, is as follows, in claim 1, which is merely amplified in statement in the other claims of the patent:

"(1) The process of forming artificial stone, consisting in molding the stone compound while in a plastic or semiliquid state in or on a mold formed of relatively dry sand, and then allow the mass to set until the sand absorbs the surplus moisture from the compound, thereby converting the latter to a solid or nonliquid form, substantially as and for the purpose set forth."

Stevens in his specifications refers to a former patent, No. 583,515, dated June 1, 1897, over which he seeks an improvement by the patent in suit.

The Stevens patent, No. 583,515, was substantially a method for forming, within a mold of sand, a casting out of cement or other suitable substance by saturating the sand, and thus, through the chemical action of the water contributed by the sand, turning the cement into artificial stone; while in the patent at bar, the sand is kept in a dry condition, the material from which the stone is to be manufactured is poured in in a wet or plastic state, and the sand drains water from the material, instead of furnishing moisture thereto. Stevens describes methods for shaping the mold and inserting facing boards in the sand, so as to make ventilating flues or edges and lines, so as to construct any shape of block which may be desired, and to a certain extent the sand itself may be used in the form of a mold for giving a general design or shape to the block.

But the important feature of the patent lies in the principle of extraction of the water, and the resulting contraction of the material into a homogeneous mass, which will fracture in rough and uneven surfaces, like the fracture of natural stone when no distinct line of cleavage is present, and in furnishing a material upon which tools may be used, and from which carved surfaces can be produced. The samples of decoration and even of architectural statuary made out of this stone, and introduced as exhibits in this case, illustrate better than description can do the exact product of the Stevens patent.

The defendant has cited the Stevens patent bearing No. 583,515 as anticipation, but it in no sense seems to show the idea of the present patent, except in so far as it plainly illustrates the improvement and desirability of the new method. None of the patents cited taught the idea finally discovered by Stevens, nor did they apply the principles thereof in such a way as to indicate those principles, nor to show their necessary consideration by any of the previous inventors in their several patents. The nearest approach is in another patent of Stevens, No. 457,231, granted August 4, 1891. In that patent, Stevens, in an attempt to manufacture artificial stone, formed a mold of sharp sand or broken pieces of stone, which he arranged in an irregular design in the bottom of a wooden box. He then poured plastic material into this mold, and found that more or less of the sand and rough material of which he had composed his mold adhered and became a part of the artificial block which he was producing, and thus gave it a rough or more or less stonelike appearing surface. The quantity of sand used in the bottom of the box was small, and the fact that Stevens states that he pours plastic material, of which "a portion of the ce-

ment sinks into the sand" and then "penetrates an unequal distance into the mass of sand by reason of the unequal density of the mass and its consequent unequal resistance to permeation by the liquid cement," indicates that to a slight extent the face of the stone produced by that patent may have been affected by the process of the patent in suit. But Stevens, in order to give the material produced under his former patent the "roughened and irregularly shaped surface of hammer-broken stone," found it necessary to form inequalities in the surfaces of his mold, and in no way seems to have considered or to have described, nor to have produced, anything except what in an accidental and immaterial way corresponded with the idea of his later patent.

It is strange that Stevens did not follow his earlier patent with the idea of the later one, much sooner than seems to have actually been the case. It is now a short step from one to the other. But it appears to the court that, although artificial stone has been used in considerable quantities in the years during the life of this patent and especially in the way of concrete walks, curbs, and extensive structures of a like nature, the principle of the Stevens patent was not suggested, and was not used with appreciative knowledge by any one, until the improvement occurred to Stevens himself, and he applied for the latest patent.

The defendant produces several English masons, who testify to the use of sand molds in England some 40 years ago, and to the application of the principle of a sand mold upon the Cosmopolitan Building, at Irvington-upon-the-Hudson, in the years 1893–97. But it ultimately appeared that Mr. Jones, who also was called as a witness, was in charge of the work at Irvington-upon-the-Hudson, and he is shown, both in his testimony and by the statements of other witnesses, to have never understood or appreciated the methods used by Stevens, until he saw them put in use by Stevens, subsequent to the application for the patent in suit. The results of Mr. Jones' and the English mechanics' work do not support the claim that they were obtained by similar methods to those of Stevens. The general effect of their testimony leads to the conclusion that, in whatever they were doing, they were using sand as a mold, for the purpose of giving shape to the concrete blocks, that the sand was ordinarily coated with some nonabsorbent or waterproof material, and that the features of the Stevens patent were neither known nor made use of to any appreciable extent.

Such an invention as that of Stevens should be given the protection of the patent law, for it is the protection and the reward of such ideas upon which the policy of the patent law itself is based. The case of Carnegie Steel Company, Limited, v. Cambria Iron Company, 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968, citing the Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899, is the conclusive standard by which processes of manufacture are held to be patentable, and in which the distinction between a mere mechanical use of a device and the process involved in the patentable use of the mechanism are distinguished. The present instance shows the application of a physical law as well as a chemical process. But the idea involved is more than the mere effect of pouring a cement

mixture into a mold. Stevens was careful to impress this point, and he says in his specification that he relies upon the sand to extract the moisture from the stone compound.

In the course of the trial the complainant manufactured stone in court, under the system used by him, with the aid of a sand mold and semiliquid material. The immediate and continued gradual abstraction of liquid was marked, and explains, better than any amount of discussion, the causes producing the results of the Stevens patent. It is apparent from this actual experiment that no construction, in which form may be given to a plastic or molten material by a mold, is responsible for the effects produced upon the plastic material employed according to the Stevens patent.

The defendant having, therefore, infringed a patent which had not been anticipated at the time of its issue, and which contained the merits of patentability, originality, and exceedingly great commercial value, should be enjoined and compelled to account; and, more important than this, the presumption of validity in favor of the patent should be strengthened by a decision upholding the patent as valid.

The complainant may have a decree.