EMERSON & NORRIS CO. v. SIMPSON BROS. CORPORATION.

SAME v. STRUCTURAL CEMENT STONE CO.

(Circuit Court, D. Massachusetts. June 5, 1911.)

Nos. 655, 656.

PATENTS (§ 328*)—ANTICIPATION—PROCESS OF MAKING ARTIFICIAL STONE.

The Stevens patent, No. 624,563, for a process of making artificial stone by the use of sand molds for drawing the surplus water from the stone compound by absorption, is void for anticipation by the prior public use of substantially the same process by one Berthelet for two years or more in the ordinary course of his business of making artificial stone.

In Equity. Suit by the Emerson & Norris Company against Simpson Brothers Corporation and same against the Structural Cement Stone Company. On final hearing. Decrees for defendants.

Louis W. Southgate and O. Ellery Edwards, Jr., for complainant.

Emery & Booth and Emery, Booth, Janney & Varney, for defendants.

HALE, District Judge. These suits are for infringement of claim 1 of Stevens' United States patent, No. 624,563, for process of making artificial stone. The claim at issue is as follows:

"1. The process of forming artificial stone consisting in molding the stone compound while in a plastic or semiliquid state in or on a mold formed of relatively dry sand and then allow the mass to set until the sand absorbs the surplus moisture from the compound, thereby converting the latter to a solid or nonliquid form, substantially as and for the purpose set forth."

The process consists substantially in: First, molding the stone compound while in a plastic or semiliquid state in or on a mold formed of relatively dry sand; and, second, letting the mass remain until the sand absorbs the surplus moisture. The former practical process of manufacturing artificial stone was by means of a rigid mold prepared in the shape of the desired block. Such mold was usually of wood or plaster of paris, or some material strong enough to resist force. The stone compound, in a wetted mass, was shoveled into the bottom of the box. An excess of water had to be avoided in order to give the stone texture, strength, and a good appearance. The process of tamping was then applied to the layer. This process consisted in the workman taking a heavy tool and ramming the mixture, in order to tightly compress it in the bottom of the box to reduce its volume, eliminate the air holes in it, and make the mass as dense as possible. After the layer had been pounded or tamped, and so reduced, another layer of the wetted compound was shoveled in, and tamped, and this process was continued until the mold was filled; the top of the mold was then evened off; and the moist block was taken out and allowed to stand and harden.

It is asserted that Stevens is the inventor of the process of doing away with this old system of making artificial stone. He relied upon the use of dry molding sand to extract or absorb the moisture from

the stone compound, instead of pounding it out.    In his specification he thus describes his process:

"I first take a box of suitable dimensions, corresponding to a molder's flask, the inner walls of which I prefer should serve as the faces against which all of the outer plane faces of the stone article shall be molded except the ornamented and opposite faces thereof.  In the bottom of this box I place a suitable layer of fine molder's sand of any suitable thickness and in a just sufficiently moistened condition to hold its form when pressed to any desired shape.  In other words, I propose to have this sand as dry as possible for the intended purpose.  Into this sand with a suitable pattern I impress the shape of the ornamented face desired.  *  *  *  I next pour into the impression thus made the stone compound in a plastic or semiliquid state, sufficiently wet to flow easily and to a depth corresponding with the desired thickness of the hollow stone."

In reference to the ingredients to be used he says:

"The cement being dry ground Portland or similar cement, and the sand being ground stone of the selected variety, its fineness depending on the character of the work to be produced."

And he points out the final step in his invention to be the use of the molding sand:

"The molding sand in my present invention being comparatively dry and relied upon to extract or absorb the moisture from the stone compound."

The claim of the patent provides for allowing "the mass to set until the sand absorbs the surplus moisture from the compound, thereby converting the latter to a solid or nonliquid form."  This process relies upon drawing the water from the wet compound by capillary attraction instead of employing the old method of tamping or ramming the compound in a hard mold.  The defendant says that the Stevens patent is void by reason of anticipation.

1. The contention of the defendant is that the Stevens process of making artificial stone has been anticipated by one Charles A. Berthelet, who manufactured artificial stone by this process during the years 1881, 1882, and 1883, in Milwaukee and Racine, Wis.  Berthelet's use had its conception in the tangible basis given by two patents to an Englishman by the name of Sellars—an English patent, No. 1,379, dated April 9, 1877; and a United States patent, No. 244,321, dated July 12, 1881.  These are for the same invention, and disclose a mold consisting of sand and paraffin for casting concrete, as described in the United States patent "in a liquid or semiliquid condition so as to obtain castings of sharp, clear, well-defined outline."  The American patent provides for "a lubricating binding material which is not affected by alkalies, such as paraffin, and a finely divided body material such as sand or charcoal."  There is much testimony that while Berthelet's use was suggested by the Sellars patent, and while he acted for a while under the Sellars patent, he used, in fact, a much broader scheme than any which the Sellars patent taught.  The evidence tends to show that he did not rely upon paraffin as a binder, but used molds of slightly moistened sand and a liquid concrete of a creamlike consistency.  Sometimes he used paraffin, and sometimes he operated with moist sand without paraffin, and poured the liquid concrete into molds which absorbed the surplus water, and thereby he converted the concrete into solid artificial stone.  The testimony tends very

strongly to show that he achieved his result by absorption or capillary attraction. He produced stone letters and numerals, ornamental window copings, signs, and plaques. He followed the Sellars practice rather than his patent; and there is much evidence that Sellars' practice involved absorbent sand molds. From his testimony it appears that he did not always wet or dampen the sand and paraffin for the molds, "but, when the mold had become too dry by exposure, water was added to give it a consistency which would admit of its being readily molded by the pressure of the hand." He varied the amount of paraffin which he mixed with the sand and found, as he says, that "the decrease of paraffin rendered the mold more porous and the increase of paraffin allowed the use of stronger concrete, and enabled a casting of a finer detail."

Up to the fall of 1881, Berthelet operated a sewer pipe manufactory; but he then turned his pipe works into a letter factory. He and his wife had visited Sellars at Birkenhead, England, where Sellars had explained the process to them of making liquid concrete in sand molds. Berthelet himself is not living; Mrs. Berthelet has testified very fully, not only from memory, but from letters and a diary which she kept. There is also the testimony of other witnesses who had means of observation in reference to the conduct of Berthelet's manufactory during the years he was making artificial stone. From the testimony I am induced to believe that the letters and numerals produced by Berthelet, and the panel upon the Blatz Brewery which has stood the test of time, were made from artificial stone produced from sand molds by absorption, or capillary attraction, after the manner set out in the claim of the patent in suit. The burden of proof rests upon the defendant, every reasonable doubt should be resolved against it, and the greatest scrutiny should be given to testimony of a long past prior use. I think the defendant has met the weighty burden of showing that the process described in the Stevens patent was known to Berthelet long before the invention of Stevens.

But the plaintiff urges that Berthelet's use at best was merely experimental. It appears that Berthelet did at first experiment, but that he soon after changed his sewer pipe business for the letter business. His own letter written in 1882 shows that he was engaged in making artificial stone products as a business; that he had $2,500 invested in it; and that his endeavor was then to make it a remunerative and permanent business. He afterwards gave it up, but not until it had passed far beyond the period of experimentation and had fully put an operative process into practice. It is true that the letters made by Berthelet and his associates were crude; that they did not have the perfection of finish that is acquired by the present use of the Stevens patent, or by the improvements upon such patent. But the testimony is convincing that the products of his process must be held to be "artificial stone"; that they were made substantially as described in claim 1 of the Stevens patent; that they were made in the ordinary course of business; and that their manufacture illustrated and taught the use of substantially the method described by the patent in suit. I must come to the conclusion that, as a business, for profit and not for ex-

periment, for more than two years, Berthelet openly made artificial stone letters and other artificial stone articles by use of sand molds, by drawing the water from the stone compound by means of absorption. I am constrained to find that Berthelet did make a public use of the processes described by Stevens in claim 1 of his patent, that his manufacture of artificial stone was not inchoate or embryonic, but that it met the severe tests of the courts. Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Gayler v. Wilder, 10 How. 496, 13 L. Ed. 504; Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 256, 8 Sup. Ct. 122. 31 L. Ed. 141; Brush v. Condit, 132 U. S. 39, 48, 10 Sup. Ct. 1, 33 L. Ed. 251; Reed v. Cutter, 1 Story, 590, Fed. Cas. No. 11,645; Walker on Patents (4th Ed.) § 95. I come to this conclusion after a careful study of the record, and with great deliberation. I am conscious of a disinclination to uphold any prior use that destroys the pecuniary value of a patent which has met with commercial success and has been of value to the community. I cannot undertake to decide, however, how far this commercial success is due to the patent in suit, or how far it is the result of improvements made by others upon the Stevens process.

This patent has been before the Circuit Court for the Eastern District of New York, in Donaldson v. Roksament Company (C. C.) 170 Fed. 192, and upon a contempt proceeding in (C. C.) 176 Fed. 368. In those cases the learned judge of that court held that the Sellars patents were not anticipatory of the Stevens patent. But the record here does not show that in those cases the Circuit Court passed upon the question of Berthelet's prior public use.

It is not necessary for me to discuss the other questions of anticipation raised by the record. A careful study of the whole testimony in the case has forced me to the conclusion that the Stevens invention was anticipated by Berthelet's prior use, and that the patent in suit is void by reason of anticipation.

The decree must be: Bill is dismissed, with costs.