EMERSON & NORRIS CO. v. SIMPSON BROS. CORPORATION.

SAME v. STRUCTURAL CEMENT STONE CO.

(Circuit Court of Appeals, First Circuit. January 30, 1913.)

Nos. 961, 962.

1. PATENTS (§ 62*)—ANTICIPATION—SUFFICIENCY OF PROOF.

The rule applied that to sustain the defense of anticipation in a patent case, by a prior use by another, where there has been a considerable lapse of time, something more than oral testimony, is ordinarily re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

quired to establish the identity of structure as between what is patented and what is alleged to have anticipated it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 78; Dec. Dig. § 62.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING ARTIFICIAL STONE.

The Stevens patent, No. 624,563, for a process of making artificial stone by the use of a mold of relatively dry sand which absorbs the surplus moisture from the stone compound, *held*, on the evidence, not anticipated, valid, and infringed.

Appeal from the Circuit Court of the United States for the District of Massachusetts; Clarence Hale, Judge.

Suit in equity by Emerson & Norris Company against Simpson Bros. Corporation, and same against the Structural Cement Stone Company. Decrees for defendants, and complainant appeals. Reversed.

For opinion below, see 188 Fed. 808.

Louis W. Southgate, of Worcester, Mass., and R. A. Parker, of Detroit, Mich., for appellant.

Frederick L. Emery and Laurence A. Janney, both of Boston, Mass. (Emery, Booth, Janney & Varney, of Boston, Mass., on the brief), for the appellees.

Before COLT, PUTNAM, and DODGE, Circuit Judges.

PUTNAM, Circuit Judge. These suits were proceedings on alleged infringements of a patent for invention, and the bills were dismissed, and these appeals taken to us by the complainant below. We find it necessary to consider only one question.

The substantial defense is anticipation, first by reference to the general use of sand molds, as to which all we need say is that it is not in the same art, as this patent relates only to artificial stone; and the alleged anticipatory publications were not within the strict rules laid down by Walker on Patents (4th Ed.) § 57, which we have several times accepted and applied. A further reference will be required to what is known as the Sellars patent, which will not be intelligible until we have proceeded somewhat further.

These suits are based on the patent issued on May 9, 1899, on an application filed November 12, 1897, to Charles W. Stevens, entitled a patent for a "process of making artificial stone," No. 624,563. The facts, except as referred to by us, are sufficiently stated in the opinion of the learned judge of the District Court for the District of Maine, 188 Fed. 808. The first claim, which is all we need consider, is as follows:

"1. The process of forming artificial stone consisting in molding the stone compound while in a plastic or semiliquid state in or on a mold formed of relatively dry sand and then allow the mass to set until the sand absorbs the surplus moisture from the compound, thereby converting the latter to a solid or nonliquid form, substantially as and for the purpose set forth."

The peculiar features of this claim are that the mold is formed of "relatively dry sand," which "absorbs the surplus moisture from the

compound." It might seem to a nonexpert doubtful whether this method of molding could succeed; but not only the complainant shows that it did succeed, but the respondents' attempts to make use of it confirm the complainant's position in this respect.

The particular defense which we need consider is an English patent to Sellars, of April 9, 1877, No. 1,379, and what came out of it. The nature of the patent is sufficiently pointed out for this appeal by the following extracts:

"This invention relates to molds and frames to be used in the formation of concrete blocks and structures, and has for its object to insure that the concrete shall not adhere to the surfaces of such molds or frames, and hence the surfaces shall present a smooth, neat and finished appearance.

"Under the first part of my improvement I make the molds of paraffin, or similar wax-like substance unacted upon by alkaline matter, mixed with sand, charcoal or other finely-divided material; in some cases paraffin alone may be used."

Then Sellars says that under the second part he forms molds of timber, etc., and under the third part he forms the molds of a rigid material, and covers the surface with lac, mastic, or other varnish; and that under the fourth part he forms the molds of metal and japan, or enamels the surfaces. This is an entirely different art than that we are dealing with, as it is only the art of constituting molds of sufficiently binding strength; so we need not consider this patent further. The difficulty arises from what one Berthelet, who became interested in Sellars and Sellars' patent, did afterwards as the result thereof in Wisconsin and Minnesota, in the years 1881, 1882, and 1883, nearly 30 years before the important evidence in this case was given. It is claimed that in that connection, and making use of the suggestions of Sellars, he extensively availed himself of substantially the sand mold pointed out by the Stevens claim which we have quoted. The case on this point is put in behalf of the defendant very forcibly, and with much care and clearness, by the learned judge who sat below, in the following language:

"Up to the fall of 1881, Berthelet operated a sewer-pipe manufactory; but he then turned his pipe works into a letter factory. He and his wife had visited Sellars at Birkenhead, England, where Sellars had explained the process to them of making liquid concrete in sand molds. Berthelet himself is not living; Mrs. Berthelet has testified very fully, not only from memory, but from letters and a diary which she kept. There is also the testimony of other witnesses who had means of observation in reference to the conduct of Berthelet's manufactory during the years he was making artificial stone. From the testimony I am induced to believe that the letters and numerals produced by Berthelet, and the panel upon the Blatz Brewery, which has stood the test of time, were made from artificial stone produced from sand molds by absorption, or capillary attraction, after the manner set out in the claim of the patent in suit. The burden of proof rests upon the defendant; every reasonable doubt should be resolved against it; and the greatest scrutiny should be given to testimony of a long past prior use. I think the defendant has met the weighty burden of showing that the process described in the Stevens patent was known to Berthelet long before the invention of Stevens."

[1] This clearly represents a very careful and thorough review of proofs in this case, and a satisfactory weighing thereof so far as all ordinary civil litigation would be concerned. The difficulty, how-

ever, is that the settled rules with reference to those Departmental adjudications which are of a quasi judicial nature, involving the hearing of parties and the consideration of what is offered by them, rigidly applied in this circuit, stand across the path of the case thus made by the respondents below. These rules were considered by us in Brooks v. Sacks, 81 Fed. 403, 26 C. C. A. 456, announced on June 10, 1897; although there they were not applied with the utmost strictness, because the case was only as between an admitted date of invention and an alleged anticipation thereof, and not as against a finding of the Patent Office in issuing the patent. This case, however, developed the underlying rule that ordinarily, in cases like the present, it is necessary that the anticipations should be supported, not merely by the testimony of one or numerous witnesses relating to matters many years previous, but by concrete, visible, cotemporaneous proofs which speak for themselves. In that case, the testimony of credible witnesses was rejected because there were no cotemporaneous visible objects of that nature, and solely for that reason. Among other cases, the rule came up again in Westinghouse Co. v. Stanley Co., 133 Fed. 167, 68 C. C. A. 523, announced on September 9, 1908. In that case the whole topic was considered, and the fact was referred to that the Supreme Court has once said that, under the circumstances here, the respondent's proofs should be "beyond reasonable doubt"; though we observed that we did not feel bound to adhere to that stringent expression. There was no difficulty in that case because only a specific date was in question, and that was settled by cotemporaneous facts beyond all doubt. The main difficulty is with reference to cases where it is undertaken by parol evidence to prove the precise characteristics of the alleged anticipatory matter, as is the fact here, and as was the fact in Greenwood v. Dover, 194 Fed. 91, 114 C. C. A. 169, decided by us on December 12, 1911. There, as against an order of the Circuit Court of Appeals for the District of Columbia, we stood in the same class as against the finding of the Commissioner in this case, and other cases involving the issue of patents. There we said that the evidence of anticipation must at least meet the expression in Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657, there repeated, namely, "that the proof must at least establish a clear conviction"; and we further explained that in this respect the action of the department was to be held to be of the high character which was required in the Maxwell Land Grant Case, 121 U. S. 325, 7 Sup. Ct. 1015, 30 L. Ed. 949, and in United States v. Bell Telephone Co., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144. The result of all these cases is that, with reference to questions of the class which we have here, namely, the identity of structure as between what is patented and what is alleged to have anticipated it, something more than oral testimony, even of the highest character, is required where there has been a considerable lapse of time. A close examination of the issues and proofs which appear in this record show that this case is peculiarly noticeable in that respect.

The case seems to have proceeded in large part on the theory that the question here was broadly between the old method of forming

artificial stone, involving tamping, and the new method by which the mechanical action, or reaction, between the material of which the mold is constructed and the plastic, or semiliquid, material of which the casting is formed, accomplishes the result desired. Very likely the patentee was mistakenly of that opinion; but it is plain that this broad distinction was made by the anticipatory patent of Sellars to which we have referred. Nearly all the testimony of the respondents, and page after page of their brief, are based on this fact. This constantly appears in the testimony of their main witness, Mrs. Berthelet, showing that she had in mind a composite mold, covered by the Sellars patent as we have explained it. This matter is perhaps put more clearly by comparing with the patent in suit the claims in the Sellars American patent of July 22, 1881, as follows:

"What I claim, and desire to secure by letters patent of the United States, is:

"1. A composition to be used in the formation of molds for shaping concrete and like plastic material, the same consisting of a lubricating binding material which is not affected by alkalies, such as paraffin, and a finely-divided body material, such as sand or charcoal, substantially as and for the purpose specified.

"2. A composition mold for shaping concrete and like plastic material, composed of paraffin and sand or charcoal, substantially in the proportions and for the purpose specified."

It is not important for this part of the case that we should point out again that Sellars' invention was for a mold, or molds, and not for a process; but wherever it appears, and from every point of view, it was for a mold of composite material. A comparison of these claims with the simple claim of the patent in this case at once makes clear the real issue here. The latter claim gives no material for the mold except molding sand, which is to be relatively dry, expressly operating by absorption. The nature of this claim is emphasized by the testimony of Benedict, who shows the process as actually carried on by the complainant in its factory, and as actually carried on by the respondent Simpson Bros. Corporation in its factory. In each case the evidence makes clear that the "workmen were forming molds of relatively dry sand, using wooden patterns," and that they poured the mixture "into the molds which they had formed in the sand"; and such clearly was the entire process as shown by this witness. Of course, as we have already said, the question at once arises in the lay mind whether this would be an effectual process; but the leading expert for the complainant, Carpenter, testified as follows:

"The fact that a dampened sand mold would hold its shape and at the same time absorb water so as to compact a nearly liquid stone compound is certainly a phenomena, which would never have been believed had it not been tried. * * *

"This discovery, which is set forth in the claim of the Stevens patent in suit, was the first disclosure to the world of the process of making an artificial stone of a homogeneous structure resembling natural stone, and in many ways superior to natural stone, and which was adapted for use in buildings of the best style of architecture."

Therefore this was plainly the entire process of the patentee. On the other hand, the Sellars process called for a combination with the

sand; and, so far as this record shows, it was practically applied in that way. Mrs. Berthelet, who saw it in England, both at the foundry of one Butler and at that of Sellars himself, said that at Butler's foundry she saw Butler's men "pouring the liquid concrete into molds made of paraffin treated with sand"; and she also said the same with reference to Sellars' factory. She further stated that the process she described was the same "we used ourselves in Milwaukee"—meaning by "we" her husband and herself. This and like this appear in her evidence over and over again. The most significant fact in her evidence is that she herself took part in preparing the sand at the hotel where she and her husband lived; that while her husband was laying out the sand she was on the floor using paraffin, and making sure that the sand was thoroughly coated with it. The process she described was comparatively tedious, and in an extensive business must have added very largely to the cost of production.

If there is evidence which tends to show that Berthelet, in whose operations the molds at first used are admitted to have been of sand coated with paraffin, came afterwards to use molds of relatively dry sand. only, it is this part of the evidence tending to show prior use which lacks the support of those concrete, visible, cotemporaneous proofs, speaking for themselves, which we 'have held necessary as above for a finding that Berthelet made such use of the Stevens process as amounted to anticipation. Except the Blatz Brewery panel and the letters and numerals produced in court, there is nothing before us having any claim to possess that character. But the panel was admittedly molded in sand coated with paraffin, and as to the letters and numerals, though the evidence regarding the place and time of their manufacture has some tendency to show that they may have been made at Racine, where molds of sand only were most used, and while such molds were being used there, it falls short of sufficient proof that these articles were actually made in such molds.

While what Berthelet did was not merely experimental in the sense of the patent law, it was not a success financially; and it is not impossible that the saving in cost arising from the simplicity of Stevens' method was equal to the difference between failure and success. At any rate, the facts here illustrate the wisdom of the rule with reference to parol evidence in cases of this nature which we have explained. In the lapse of time the memory becomes especially confused as to the identity of matters similar in part, and especially of processes. Also, if they establish anything, they establish that Sellars' method and Berthelet's method were not the method of Stevens. Stevens' patent must be sustained precisely as it stands, and for nothing more. Any process which uses for any practical purpose, to an extent not absolutely negligible, any element besides the sand described and claimed by Stevens, cannot be held to be an infringement.

[2] In the case against the Simpson Bros. Corporation, the testimony of Benedict, to which we have referred, establishes infringement, and the other facts explained establish the validity of the patent in suit.

In the case against the Structural Cement Stone Company the question of infringement is left in a somewhat unsatisfactory condition,

but the complainant offered some evidence tending to prove infringement, and we are not satisfied that this has been fully met by the defendant.

In both cases the judgment is:

The decree of the Circuit Court is reversed, and the case is remanded to the District Court, with directions to enter a decree for the complainant for an injunction and an account; the complainant recovers its costs of appeal; and the costs of the District Court are to await final decree.