·PERFECTION COOLER CO. v. CORDLEY et al.

(District Court, D. Massachusetts. August 26, 1913.)

No. 83 (C. C. 521).

PATENTS (§§ 62, 328*)—ANTICIPATION—WATER COOLER.

Evidence considered, and *held* insufficient to show anticipation of the Newell patents, No. 895,781 and No. 895,782, for water coolers by an unpatented structure, under the rule that to establish the identity of the two structures, after the lapse of a number of years, something more

than oral testimony is required, and in view of the fact that, conceding identity, the evidence that the use of the alleged anticipating structure antedated the Newell invention rested entirely on the recollection of witnesses and was not clear.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 78; Dec. Dig. § 62.*]

In Equity. Suit by the Perfection Cooler Company against Henry G. Cordley and others. On supplemental bill in the nature of a bill of review, filed by defendants by leave of court March 26, 1913. Supplemental bill dismissed.

For former opinion, see 199 Fed. 440.

A. S. Pattison, of Washington, D. C., James A. Tirrell, of Boston, Mass., and Livingston Gifford, of New York, N. Y., for complainant.

Ellis Spear, Jr., of Boston, Mass., A. P. Greeley, of Washington, D. C., and W. K. Richardson and Harrison F. Lyman, both of Boston, Mass., for defendants.

DODGE, Circuit Judge. This bill, filed by the defendants, has been answered by the plaintiff. The additional evidence tending to prove or disprove the additional facts alleged in the bill has been taken. The question presented is whether it requires any modification of the conclusions arrived at by Judge Colt, upon which his decree, entered September 16, 1912, and adjudging certain claims of the patents sued on valid and infringed, was entered. See 199 Fed. 440.

The main defense before Judge Colt was that the patents sued on, being United States patents 895,781, August 11, 1908, and 895,782, of the same date, both to Isaiah Newell, were void for want of invention, in view of the prior art. 199 Fed. 444, 445. As to alleged anticipations, Judge Colt's opinion refers only to the "Rose invention," covered by United States patent 715,609, December 9, 1902, and to a so-called Estes cooler. 199 Fed. 445.

Under their supplemental bill, the defendants have undertaken to establish an anticipation of Newell by a water cooler apparatus said to have been devised by Charles R. Towle, of Haverhill, Mass., and to have been in public use at a factory in Haverhill from and after some time in June, 1900. Newell applied for his earlier patent July 22, 1902, and for his later patent September 26, 1903. Proof that the Towle cooler embodied the inventions covered by the Newell claims, which this court has sustained, and was in public use, as the supplemental bill alleges, from and after June, 1900, would entitle the defendants to have the decree of September 16, 1912, superseded by a decree dismissing the plaintiff's bill, unless Newell can claim an earlier date for the inventions described in his first patent than July 22, 1900, two years before his first application.

Newell died in 1909, pending the litigation here and elsewhere in which the validity of his patents has been questioned. The plaintiff contends that his date of invention was in 1899. The Court of Appeals for the District of Columbia, upon appeals from the Patent Office in interferences to which he was a party, affirmed decisions by the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Commissioner of Patents awarding priority to him. In those proceedings Newell alleged conception and disclosure in the spring of 1899, and reduction to practice in the early summer of 1899. His adversaries alleged conception in August, September, or November, 1901, and reduction to practice in February, 1902. In the opinion of the court it was said:

"Taking, therefore, any date between the fall of 1899, or the early part of 1900, * * * as a date for the reduction of the invention to practice, we think neither concealment nor abandonment can be charged against Newell."

It was also said in the same opinion, regarding a large number of exhibits offered by Newell, that they show him to have been engaged constantly, from the summer of 1899 up to and after the date of his application, in experimenting on and improving his original invention. Rose v. Clifford, 31 App. D. C. 195, 199, 200.

Judge Colt's opinion in this court contains nothing further in reference to these questions than the following:

"In view of the evidence in the present record and the decision of the Court of Appeals in Rose v. Clifford, supra, it seems to me that the complainant has fixed the date of the Newell invention at a time prior to the Rose invention which was in interference in that case, and which is covered by his patent, No. 715,609, dated December 9, 1902."

The defendants further assert, in their supplemental bill, the recent discovery by them of evidence to prove that an exhibit, claimed by Newell to be the first cooler embodying his improvements and to have been built by him in the spring or early summer of 1899, was not in fact built before 1902, and that other cooler exhibits claimed to have been made by Newell in 1899 were not in fact made until 1902 or thereafter. If these facts are established by their evidence, they also are sufficient to prevent Newell from being regarded as the first inventor, and will require the decree of September 16, 1912, to be set aside in the defendants' favor.

A previous opinion in this case, dated March 22, 1913, has stated the grounds upon which the defendants have been allowed, after the case had once been decided here, to introduce evidence for the above purpose; the record on their pending appeal having been returned here for that purpose.

1. Is the evidence taken since March 22, 1913, under the supplemental bill, sufficient to prove the Towle cooler to have embodied the sustained claims of the Newell patents, and to have been in public use from and after June, 1900?

The first question here is: Precisely what was the Towle cooler? It has been described by several witnesses for the defendants, principal among whom are Charles R. Towle, who says he contrived it, and Charles H. Morse, who says he made it. Charles R. Towle has been associated with Fox, in whose factory at Haverhill the public use claimed to have been made of the Towle cooler is said to have taken place, since 1895, as foreman of a department in that factory. Charles H. Morse is a tinsmith in Haverhill, employed by W. C. Bennett & Co., of that place, from 1899 to 1907, and subsequently by their successor, O. F. Bennett. Towle says he made a rough sketch,

explained it to Morse, and got him to construct the device according to the sketch. The sketch is not produced, but what Morse is said to have constructed, or part of it, is made a defendants' exhibit, marked "Fox Factory Cooler." It consists of an outer wooden box, 27 inches long, 15 inches wide, and 15 inches high, with an inner metallic lining; a space being left between lining and box wherein is found an insulating packing. Within is a smaller metallic tank, 11 inches long, 5 inches broad, and of nearly the height of the metallic casing of the box. A pipe leads from this tank through the metallic lining and the box, provided outside the box with a faucet from which the handle is absent. Another pipe leads from inside the lining through the outside of the box. This appears to have been intended also to carry a faucet outside the box, but no faucet is now there. Morse says he constructed this apparatus according to Towle's sketch and instructions; the wooden box being furnished by Towle.

This "Fox Factory Cooler," as it stands, when first brought forth for use in litigation involving Newell's patents, was taken in 1910, according to the defendants' evidence, from under the sink in the making room of the Fox factory. It then contained rubbish, and had not been used as a water cooler since 1904. The witnesses Towle and Morse, above mentioned, say that it had, when originally constructed, two covers, now missing, a larger cover for the larger part of the metal-lined box, and a smaller cover for the smaller tank within; the smaller cover being provided with a hole having beveled edges and adapted to receive the neck of an inverted water bottle or carboy. They say, also, that each of the two outlets mentioned was provided with a faucet. Upon completion, according to them, the device was put to use in the making room referred to; ice being placed in the box outside the smaller tank, water for drinking being contained in that tank, supplied to it from bottles or carboys supported in an inverted position by its cover, their necks projecting downward through the cover below the level of the water in the tank beneath. From this tank the drinking water was drawn, as required, through the connected outlet and faucet. The place of the water drawn from the tank would then be immediately supplied from the bottle above, through the water in which air would bubble until the air pressure again balanced. The drinking water was kept cool by the ice or melted ice kept surrounding it in the box; the water from melted ice being withdrawn as necessary through the other outlet and faucet.

Assuming it to be true that the exhibit produced was, when complete, constructed and operated as above, I cannot doubt that it embodied all the inventions covered by the Newell claims in controversy.

But, under the decisions in this circuit, the burden is on the defendants to establish the identity of structure, between what is patented and what they claim to have anticipated it, by something more than oral testimony, even of the highest character, when, as here, there has been a considerable lapse of time; and for this purpose "concrete, visible, contemporaneous proofs which speak for themselves" are necessary. Emerson, etc., Co. v. Simpson, etc., Corp. (C. C. A.) 202 Fed. 747. The exhibit "Fox Factory Cooler," as it stands, can hardly be

said to speak for itself. Without its covers, at least, it does not furnish in itself a complete demonstration that the Newell claims were embodied in it. Oral testimony has to be resorted to for that purpose, and all the testimony relied on for the purpose comes from witnesses who testify after a long lapse of time. None of their testimony was taken before 1911, while the original construction of the exhibit is said to have been in 1900, and by agreement of all it had not been in operation since 1904. Whether it sufficiently answers the above description of what is required in a situation like this is by no means clear.

Conceding, however, that from the exhibit as we now have it, faucets, covers, and an inverted bottle supported by one cover in the requisite position may be inferred, the defendants' purposes require, as against Newell's first patent, that its use before July 22, 1900, be shown. Towle and Morse testify, with positiveness, that after they had made the exhibit above it was put into use, in its completed form, in the "making room" of Charles K. Fox's shoe factory, in Haverhill, and that this was done in 1900, at the beginning of the warm weather. Towle says it was in the first part of June, 1900. Morse does not undertake to fix the month, but says he moved to Haverhill in the fall of 1899, and did his work on this exhibit at the beginning of the following summer. There is no serious dispute that during the warm weather drinking water was kept in the making room referred to, in various forms, that coolers of more than one kind were there tried, and that during one of the summers between 1899 and 1904 a cooler wherein the drinking water was supplied from inverted bottles over a tank—whatever its precise interior construction—was installed by Towle and used there for a time. As to the precise date of this installation and use there is much conflict, and many witnesses have testified on each side. Of all these witnesses, Towle and Morse claim to have been more immediately concerned with the installation than any others, and their testimony regarding the date is therefore first considered.

Like all the other witnesses, they gave their testimony, now before the court, more than 10 years after the summer of 1900. Little confident reliance can be placed upon the mere recollection of any witness, after such a lapse of time, when the question is in which of two or three successive summers such an event as this occurred, even if his recollection be aided by reference to an established date of some other event. Especially when recollections are in conflict, something corresponding to the tangible proofs required to establish identity of structure would seem equally essential, even for a preponderance of evidence. Written memoranda made at the time might supply what is here necessary to supplement recollection; but neither side has been able to produce anything of this kind bearing directly upon the date which is in dispute. The nearest approach to anything of the kind is found in the evidence of Miss Thompson, called by the defendants. She says she kept the books of W. C. Bennett & Co., Morse's employers, from 1896 to 1907. The books so kept by her, down to 1906, were destroyed near the end of 1908; but before their destruction, late in 1907 or early in 1908, she says she found in them, after a search made at Mr. Towle's request, a journal charge against

nim, under date of June 18, 1900, in her writing, for "making water cooler." This date she wrote down at the time she found it on a piece of paper, which she gave Mr. Towle. Independently of what she found, she does not undertake to fix the date of making the cooler. Towle says Miss Thompson told him in 1908 that the date she found was in 1900, but does not produce the paper she gave him. Miss Thompson's testimony, given three years after her search of the books, and Towle's testimony, not only that as to the statement of Miss Thompson to him, but also his testimony that the cooler was built in June, 1900, have to be considered in connection with an affidavit shown to have been made by him in 1910, a year before he testified in this case, and two years after Miss Thompson's search, wherein he stated that the cooler was built "in the spring of 1899."

Towle's statement in this affidavit of 1910 is that he "directed C. A. Lawson to have a cooler made as follows," etc.; and in his testimony here he admits that the cooler he then referred to was the Towle cooler here in question. Lawson himself is a witness for the defendants, on whose behalf he testified as follows: Up to 1905 he was selling drinking water in Haverhill from the Smiley spring. Early in 1900 he got the business of the whole shop at the Fox factory, another dealer having before that divided it with him. About May 1, 1900, he put into the making room a syphon cooler which he describes. This was later replaced by a cooler so described by him as to identify it with the Towle cooler. Towle had it made, Lawson agreed to pay half the costs, and Towle agreed that this should entitle Lawson to make others like it for his own use. He made such others, the next year and thereafter until 1904, to the number of about 20. It was about the middle of June when the Towle cooler was first put into the Fox making room. He or his employés kept it supplied with drinking water and ice from the time it was installed until its use there was discontinued in 1904.

As to Lawson, it appears that in October, 1904, he wrote in reply to inquiries by James H. Griffin, opposed as counsel at the time to Newell in the interference proceedings above mentioned, that the Towle cooler was put into the Fox shop the last of June or the first of July, 1900, but he could not give the exact date. But it appears that in February, 1910, Lawson also swore to an affidavit stating that "in the spring of 1899 he shared with Mr. C. R. Towle, of Haverhill, Mass., the expense of making a water cooler," of which he proceeded to give a description agreeing with that given by Mr. Towle. Lawson's first testimony in this case was given in the spring of 1911; but when again examined, in April, 1913, he declared that he was not so sure of the date of the Towle cooler installation as he had been in 1911. He had been a business competitor of Newell, and admitted that they were not particularly friendly. None of the above are circumstances which encourage reliance upon his recollection regarding the date here in question, without regard to testimony still later given by him on the plaintiff's behalf, after his examination as a witness for the defendants had been concluded, and which appears to have been the result of representations made to him by the complainant's

agents or counsel, no representative of the defendants being present, regarding discoveries said to have been recently made as to matters affecting his testimony.

Lawson's connection with the installation of Towle's cooler has seemed to me to make him a witness second only in importance to Towle and Morse on the question of date. Next after him seems to come Edward J. Hayden, employed by him in the delivery of Smiley spring water during the seasons of 1899, 1900, and 1901. He says his delivery route included the Fox making room during these seasons, and according to him a cooler answering Lawson's description of his syphon cooler was there in use at the beginning of the season of 1900; but, because it did not work well, it was replaced after a short trial by Towle's cooler, and this happened about the end of the second week in June. Hayden also says he accompanied Towle to Bennett's, when Towle left the sketch for his cooler there, and heard him explain the sketch. Hayden says, further, that he supplied the Towle cooler with water, when completed, daily during the remainder of the season of 1900 and during the whole season of 1901, after which he left Lawson's employ. He continued to work in Haverhill until 1907 or 1908, since when he has been at his home in Nova Scotia. Within two or three years prior to his examination in 1913, he had corresponded with Lawson regarding the Towle cooler. Before he left Haverhill he had been interviewed by Mr. Griffin, above mentioned, concerning it.

M. K. Wentworth, a competitor of Lawson's in the spring water business in Haverhill, testifies to having seen an inverted bottle cooler, which he so describes as to identify it with Towle's, in the Fox making room about the last of June, 1900, again during the season of 1901, and again during the season of 1902. In 1905 his concern recovered the Fox factory business from Lawson; but he saw nothing more of the Towle cooler then, as above stated, until he saw the exhibit "Fox Factory Cooler" in January, 1910, under the sink there. His visits to the Fox factory during the seasons of 1900, 1901, and 1902 were for the purpose of regaining his former trade there in spring water. But Wentworth, like Towle and Lawson, made an affidavit in February, 1910, containing the statement that a cooler like Towle's was used in the Fox factory "early in the year of 1899." At the time these affidavits were given, Wentworth was actively allied with Rose, one of Newell's adversaries in the interference proceedings, and he seems, indeed, to have been the person by whose efforts the exhibit "Fox Factory Cooler" was brought to light in 1910 from its position underneath the sink in the Fox making room, where it had lain in disuse since 1904.

Rose was defendant in 1910 in a suit upon the Newell patents, brought by the present plaintiff in the District Court for the New York Southern district. In that suit Rose has now submitted, without a hearing, to a decree against him. But in 1911 he took evidence before an examiner, to be used in it, tending to prove anticipation of Newell by the use of the Towle cooler in the Fox making room as early as June, 1900, which is here asserted. Evidence was

also taken by the plaintiff to meet that taken by Rose. Much of the present record consists of evidence thus taken in 1911, brought into the present case by stipulation. The witnesses referred to above, except Hayden, are among those whose testimony was originally given for use in the New York suit; Charles R. Towle, Lawson, and Wentworth having also been recalled and further examined for the purposes of this case. The defendants' record here includes the testimony of 8 other witnesses claiming to have worked in the Fox factory during the season of 1900, or immediately after it, examined on Rose's behalf in 1911; and the plaintiff's record the testimony of 8 other witnesses making similar claims, then examined on the plaintiff's behalf. Besides recalling some of those then examined by them, the defendants have, for the purposes of this case, examined 12 additional witnesses claiming to have worked in the Fox factory in 1900 or 1901. The plaintiff has recalled some of the 8 witnesses of this class whom it examined in 1911, but has called no others in addition.

Of the 12 witnesses for the defendants above referred to, 3 (Chisholm, Howard, and E. D. Garland) were examined by the plaintiff in reply, after the conclusion of the defendants' evidence. The plaintiff moves to strike out their depositions, as not properly in rebuttal of any evidence introduced by it, and as taken at a time not affording a proper opportunity to meet it. The evidence of the 3 witnesses referred to is undoubtedly of a kind which ought to have been taken before the defendants closed their evidence; but the motion to strike it out is denied, no application having been made to the court at the time for an opportunity to contradict it. The circumstances under which it was taken, however, cannot be disregarded in estimating the weight to which it is entitled.

The evidence of all these former employés at the factory, called by both sides, has been examined. It is voluminous, and, of course, conflicting. Discussion of it in detail, and of the various considerations arising from it, which tend to encourage or discourage reliance upon the recollection of the witnesses, respectively, regarding the time during which the Towle cooler was in use in the making room, or the time at which such use began, would greatly extend this opinion, but, it is believed, without corresponding advantage. Were the question one to be determined by a mere preponderance of the evidence directly bearing upon it, without regard to the requirement of tangible proofs above referred to, I should be prepared to hold it proved that the Towle cooler was used, as the defendants contend, in the making room beginning in June, 1900, and thereafter during successive seasons until 1904. A numerical preponderance is not here referred to, but the preponderance arising from comparison of the testimony of those witnesses whose recollection, on the whole, seems to me most likely to be right.

But I am nevertheless unable to hold that the evidence as a whole, unsupported as it is by anything in the nature of tangible proof, is sufficient for that clear conviction of the truth of this conclusion which is necessary for the decision that the anticipation of the Newell claims

by the Towle cooler, alleged in the supplemental bill, is sufficiently established. The following considerations, some of them already indicated, obstruct any such clear conclusion, even upon an apparent preponderance of the evidence, because of the uncertainty they suggest, in the case of each witness, whether his recollection of what happened 10 years before he testified is really an unbiased recollection:

Newell, the patentee, lived in Haverhill, and was well known there from 1899 until the time of his death. Towle says he knew him in 1900, that he visited the making room during the summer of that year, knew that the Towle cooler was in use, and late in the summer of 1900 questioned Towle about it, near Newell's place of business, on Wingate Street, in Haverhill, and said Towle was using his invention. Towle discontinued its use in 1904 because Griffin, opposed to Newell in the interference proceedings, while attending the taking of testimony on Newell's behalf in Haverhill, in September, 1904, called at the factory inquiring about it, and informed Towle that there was liable to be trouble over its use, as it was a patented article. Attempts were made, at about the same time, by both parties, to find persons in Haverhill who could testify in those proceedings regarding the date of the Towle cooler. In 1910 and 1911 attempts were again made by both parties in the suit against Rose to discover witnesses in Haverhill upon the question of this date, and this time upon a more extensive scale, resulting, as has appeared, in the taking of much of the evidence now before the court; and since Judge Colt's decision, in September, 1912, when the present defendants appear to have first heard of Towle's cooler, both parties to this suit have conducted still further investigations for the same purpose, in Haverhill, with much zeal, and many days have been spent there by the agents of each party and their counsel in searching for and examining witnesses. Not a few of the witnesses examined have talked with representatives of both sides of the controversy. Towle has, during all this time, continued to be foreman of the making department in the Fox factory. Fox, owner of the factory, was director in a water company whose interests were opposed to Newell's. There are indications that, as would be natural, the attitude of Towle and Fox upon the question of the Towle cooler was understood by Haverhill shoe workers acquainted with affairs in the factory, though I find nothing to show influence exerted by them upon any witness. It is difficult to suppose, however, that any witness, examined about the date of Towle's cooler, has not heard or taken part in discussions about it before he came to testify, or that in making up his mind regarding it he has been wholly unaffected by the opinions of others. Whether the cooler was in the Fox making room in 1900, or not until later, appears to have been a familiar and often disputed question, at least since 1904.

The plaintiff has relied much on the evidence of Miner, a witness who delivered Smiley spring water for Lawson during the season of 1900, and produces a book containing entries of customers and deliveries made at the time—upon a paragraph published in the Haverhill Gazette of August 3, 1900—and upon a bill for a refrigerator produced by Lawson when the plaintiff examined him, dated July 21,

1900, and said by him to be the bill for the refrigerator out of which he made his syphon cooler, put into the making room, according to his first testimony and that of Hayden, at the beginning of the season of 1900, found unsatisfactory, and replaced in June by the Towle cooler. Miner says he never saw this syphon cooler during the season of 1900, except at a stand set up by Lawson on Merrimac street, Haverhill, for the sale of Smiley spring water; that it was used there for about a month, and then taken to Lawson's house. The newspaper item mentions the establishment of the stand, but says nothing about any cooler used there. Lawson assigns the production of the refrigerator bill, of Miner's book, and of the newspaper item as the reasons for his final doubt whether the Towle cooler can really have been installed as early as June, 1900, in substitution for his syphon cooler. The plaintiff insists that these pieces of evidence have proved that date impossible. This I cannot accept as a necessary conclusion; there being nothing more than Lawson's recollection to prove that the refrigerator bill really fixes the date of construction of his syphon cooler. I see no necessary reason why, notwithstanding the pieces of evidence referred to, Lawson's original account may not be true. It must be conceded, however, that they further obstruct a clear conviction from the whole evidence in favor of the date alleged by the defendants for the Towle cooler.

2. Is the evidence taken under the supplemental bill sufficient to prove that the coolers which Newell claims to have made in the early part of 1899 were not in fact made until later, or not before 1902?

At the hearing before Judge Colt, the record in the interference proceedings above mentioned was one of the plaintiff's exhibits. Judge Colt's opinion does not refer to anything in that record, though his decision in the plaintiff's favor refers, as has been stated, to the final decision in the interference proceedings. The defendants now attack Newell's testimony, found in that record, regarding three exhibits put in evidence by him during that testimony. They have been since offered by the plaintiff in this case as (1) "Newell Coil Pipe Inverted Bottle Cooler," (2) "Newell Diaphram Inverted Bottle Cooler," and (3) "Newell Diaphragm Center Feed Inverted Bottle Cooler."

Newell, as is not disputed, moved his place of business in Haverhill from Wingate street to Washington street late in August, 1900. Regarding the above three coolers he testified that he completed (1) at his Wingate street place in the spring of 1899; that, when he produced it, it was "just as it was when he first made it"; that he completed (2) perhaps a week or two later than (1). The above he later corrected by stating that (1) and (2) were made, not in the spring, but in the early summer, of 1899. He stated that he made (3) after having operated (1) and (2), and that he completed it not later than the last of July, 1899. In his best judgment all three exhibits were the same when he produced them as when he first completed them; no changes in them had been made. All three were operated at his Wingate street place as soon as they were completed.

Close examination of certain brass faucets forming part of (1) and (3) of the above exhibits discloses the mark upon them, "Pat'd Aug.

1, '99." This fact is said to have been first discovered by Rose's counsel in the New York suit against him, and by these defendants not until after Judge Colt's decision. It does not appear to have been noticed during the interference proceedings. The manufacturer of these faucets, examined in the Rose Case, has testified that no faucet so marked could have been made at a time earlier than three or four weeks after August 1, 1899.

I agree with the defendants that the mark on these faucets shows Newell to have been in error in stating that these coolers were made by him in the spring or summer of 1899, and also shows that Cram, a witness for Newell in the interference proceedings and for the plaintiff in this case, could not have seen all three in operation by Newell at Wingate street during the same period, or before July 1, 1899, as he says he did, and shows that Foster, also a witness for Newell in the interference proceedings and for the plaintiff here, could not have seen any of them, as he says he did, in 1898. But I do not think it necessarily follows that either of these three witnesses made the erroneous statements referred to knowing them to be false, or that their testimony that the coolers were in operation by Newell at his Wingate street place for some time before he left it, about September 1, 1900, is wholly discredited. To this extent it is supported by other witnesses, and is not to be disregarded, unless the defendants have proved, as they contend, that cooler (1), which Newell says he made first, was not in fact made before January, 1902.

To prove this, they rely upon the testimony of Stultz, formerly employed by a plumbing concern in Haverhill called the Haverhill House Heating Company, and upon entries which he identifies in the books of that concern. Stultz's testimony now before me was taken in April, 1912, in the suit against Rose. He says he made cooler (1) for Newell in January, 1902, and he identifies "Newell Entry No. 11" in one of the books as a contemporaneous entry of the work, made by him. The entry contains in itself nothing sufficient to connect it clearly with cooler (1), or with any such cooler. It was not dated when made, though carried into the ledger by the bookkeeper under date of January 24, 1902. Stultz, though he did not testify until 1912, went over the books with Rose 6 or 8 years before his testimony was given, and found for Rose the entries here relied on. It is Stultz's recollection alone, after 2 years at least had passed since January, 1902, upon which reliance must be placed if his statement is to be accepted. I do not find it necessary to discuss the evidence produced by the plaintiff tending to show that Stultz's entry on the books bears traces of alteration since it was first made. I should in any case hesitate to accept his testimony as proving that cooler (1) was not made before 1902. It is evidence from Haverhill, brought forward for the first time after Newell's death, although within the knowledge of parties opposed to Newell from a time considerably before his death. I am unable to regard it as sufficient to prove the fact asserted.

Statements on cross-examination by McAree, one of the plaintiff's witnesses, are also relied on by the defendants. His testimony was taken for the Rose Case, and he was also called by the defendants in this case. Like Stultz, he was a former employé of the Haverhill

House Heating Company. The defendants claim that he identified coolers (2) and (3) as made by the company, and only after Newell had moved to Washington street. I am not satisfied that his answers referred to really mean just this; but, if they do, they still leave it possible for these coolers to have been made in 1900. I cannot find it proved that they were not made in 1899 upon the strength of Mc-Aree's statements.

The defendants seek to draw, from the books of the Haverhill House Heating Company and from an examination of the testimony of these and other witnesses in connection with them, further conclusions inconsistent with Newell's claim to have made the cooler exhibits above mentioned in 1899. According to the defendants, the first inverted bottle cooler Newell ever made is shown to be what is referred to as the "engine house cooler," installed in an engine house in Haverhill July 1, 1901. Without discussing these subjects in detail, I have been unable to find in the evidence bearing upon them sufficient definite support for the defendants' conclusions.

3. The defendants insist that the Towle cooler must be found, even on the plaintiff's evidence regarding it, to have been in use in the Fox making room before September 26, 1901, and thus to have anticipated Newell's second patent. But I am unable to discover enough in the evidence, taken together, to warrant the finding that any definite date, even in 1901, is the date upon which the use of the Towle cooler then actually began.

For the reasons above stated, I must dismiss the defendants' supplemental bill, and allow the interlocutory decree for the plaintiff to stand as entered September 16, 1912.