NATIONAL MALLEABLE CASTINGS CO. et al. v. T. H. SYMINGTON CO.

(Circuit Court of Appeals, First Circuit. February 3, 1916.)

No. 1147.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—DRAFT-RIGGING FOR RAILWAY CARS.

The Byers patent, No. 673,419, for a draft-rigging for railway cars, the special feature of which is the ready removability of the shock-absorbing parts in case of breakage, claims 3, 5, and 6, *held* not anticipated, valid, and infringed; claims 1, 2, and 10 *held* not anticipated and valid, but not infringed; and claim 8 *held* void for anticipation, and also such claim and claim 7 not infringed.

2. PATENTS ☞259—CONTRIBUTORY INFRINGEMENT.

A defendant is not chargeable with contributory infringement because it manufactures and furnishes to another parts used in an infringing structure, where none of such parts are elements of the patented combination.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 400-402; Dec. Dig. ☞259.]

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in equity by the National Malleable Castings Company and another against the T. H. Symington Company. Decree for defendant, and complainants appeal. Reversed.

For opinion below, see 222 Fed. 517.

Clarence D. Kerr, of New York City (Charles Neave, of New York City, on the brief), for appellants.

Gilbert P. Ritter, of Washington, D. C. (W. Stuart Symington, Jr., of Baltimore, Md., of counsel), for appellee.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

BINGHAM, Circuit Judge. The plaintiffs, the National Malleable Castings Company and Jacob J. Byers, are the exclusive owners of

United States letters patent No. 673,419, issued to them May 7, 1901, on the application of said Byers filed April 21, 1900, and complain of its infringement by the defendant, the T. H. Symington Company.

The patent is for a draft-rigging for railway cars, and relates to structures used for coupling cars and intended to prevent the shock or jar, due to pushing and pulling the train, from being transmitted from car to car. To do away with this it has been customary to provide a cushioning or yielding device between each coupler and the car to which it is attached. This mechanism is called a draft-rigging and includes the drawbar carrying the coupler at its outer end, and at its inner end shock-absorbing mechanism interposed between the drawbar and the parts which are rigidly connected with the car.

The shock-absorbing mechanism of the patent in suit consists of a single spring or a pair of springs arranged one above the other, the ends of which are engaged by followers, the springs and followers being inclosed by a yoke, the arms of which are connected to the rear end of the drawbar by rivets or a removable key. This mechanism is held in place by parts rigidly connected to the car, and the relation between the spring mechanism and the parts rigidly connected to the car is such that, whether the car is pulled or pushed, the springs will be compressed between the drawbar and the car and the shock thus greatly reduced.

On freight cars where great weights are drawn, it is necessary to make the parts very strong and heavy. The weight of those provided under the patent in suit are as follows: Coupler, 300 pounds; yoke, 112 pounds; springs, 55 pounds each; followers, 60 pounds each; key, 40 pounds; spacer-block, 15 pounds; making a total of over 700 pounds. Notwithstanding the great strength of the parts, they frequently break and have to be replaced. The capacity of ready removal and replacement of the parts is, therefore, an important factor, and, in view of their weight and location in a limited space under the car, the arrangement of the mechanism so that the desired result may be accomplished presents a difficult problem.

[1] The special feature relied upon by the plaintiffs in connection with their device is that the shock-absorbing mechanism may be placed in position after the other parts have been affixed to the car, and, in case of breakage, may be removed without disturbing the yoke and drawbar; and they contend that Byers was the first to invent a mechanism presenting the combination of elements disclosed in his patent that would answer these requirements.

In the specification, after referring to certain drawings which represent the shank of the drawbar and the pocket, which is set between the draft timbers to which it is affixed by bolts, the patentee says:

"The pocket may be cast in a single piece and is provided with horizontal lugs 5 5, which extend across the pocket, above and below, and constitute abutments for the followers 6 6', which are set in the pocket. The pocket and lugs are suitably braced by metal ribs or flanges, as shown. 7 7' are springs, placed, preferably, one above the other between the followers, and to hold them in place, as well as to limit the approach of the followers, I may provide the latter with projecting stops 8, which extend from such followers between the springs. The drawbar shank 2 is connected with the rear follower 6' by a yoke 2', which is fixed to the drawbar by riveting or otherwise, and extends

within the pocket, between the lugs and around the rear follower, as shown. The pocket is open at the bottom, so that the follower-plates and springs may be removed freely from within the yoke in a vertical direction without the necessity of disengaging the yoke from the drawbar, since the follower-plates are not connected with the drawbar otherwise than by being placed between the sides of the yoke. This removal is made possible by taking off a cap-plate 9, which closes the opening at the bottom of the pocket and is secured by bolts 9a, and the follower-plates can then be pried out by means of a tool applied to toothed recesses 10, formed in the edges of the follower-plates."

He also provides for:

"A stop-piece 12, made separate from the follower-plates and interposed between the springs, performing the same function as is performed by the projections from the follower-plates shown in Figs. 1 and 4."

He also provides for:

"In addition to the stops 12 * * * as an alternate construction stops 18, either hollow or solid, which may be set axially within the springs between the follower-plates."

He refers to Fig. 4 as presenting a front elevation of the follower, which discloses that it is rectangular in shape, but in the figure has the horizontal stop 8.

The claims said to be infringed by the defendant are 1, 2, 3, 5, 6, 7, 8 and 10. They read as follows:

"1. A draft-rigging, having a combination, with the drawbar, a yoke, the arms of which are connected to the sides of the drawbar, springs arranged one above the other within the yoke, and followers also arranged between the arms of the yoke, said springs and followers being removable from below, independently of the drawbar, substantially as described.

"2. A draft-rigging having a yoke, the arms of which are adapted to be connected to the sides of the drawbar, springs arranged one above the other between the arms of the yoke, and followers adapted to fit against the ends of both springs, and also contained between the ends of the yoke, said springs and followers being removable from below, independently of the drawbar, substantially as described.

"3. A draft-rigging having a pocket, lugs, extending horizontally across the pocket, at the upper and lower portions thereof, respectively, followers within the pocket which bear against the lugs, and a yoke which extends within the pocket between the lugs and around the rear follower, substantially as described."

"5. A draft-rigging having a yoke open at the bottom and having a spring and followers arranged between the arms of the yoke, and a pocket within which the yoke extends and which is also open at the bottom to permit removal of the spring and followers independently of the drawbar, substantially as described.

"6. A draft-rigging having a yoke open at the bottom, and having a spring and followers arranged between the arms of the yoke, a pocket which contains the yoke, and is also open at the bottom to permit removal of the spring and followers, and a detachable closure for the opening in the pocket, substantially as described.

"7. A draft-rigging having, in combination with the drawbar and spring mechanism, a yoke, the arms of which are connected to the sides of the drawbar, a pocket within which the yoke extends, and a key which extends horizontally through the drawbar and yoke, and through slots in the walls of the pocket, substantially as described.

"8. A draft-rigging having springs set one above the other, and a follower engaging the ends of both springs and having at the middle a stop projection which separates the springs, substantially as described."

"10. A draft-rigging having springs arranged vertically, one above the other, followers, a yoke between the sides of which the springs and follow-

ers are set, said springs and followers being removable vertically from below, independently of the drawbar, substantially as described."

Claim 8 relates to a draft-rigging having springs, one above the other, and a follower engaging the ends of the springs with a stop projection at the middle and separating the springs. It does not call for a yoke, but would require a horizontal one if a yoke were used.

Claims 1, 2, and 10 are more general. They disclose a draft-rigging having in combination a drawbar, a yoke, springs and followers. The construction called for in these claims is such as to require the yoke to be placed in a horizontal position, with its arms connected, or adapted to be connected, to the sides of the drawbar. The springs are arranged vertically, one above the other, within the yoke, and the followers are "arranged," "set" or "contained" between the arms, sides or ends of the yoke, both springs and followers being removable from below, independently of the drawbar.

In claims 3, 5, 6 and 7 a pocket is introduced as an additional element; and in claim 3 the element of "lugs extending horizontally across the pocket at the upper and lower portions thereof, respectively," is specified, which element does not expressly appear in the rest of these claims. In this claim, the followers bear against the lugs, necessitating their being placed in a vertical position within the pocket, and the yoke, which extends around the rear follower and between the lugs of the pocket, is of necessity placed horizontally. This claim does not enumerate springs as an element in the combination, but, as a draft-rigging embodies a shock-absorbing mechanism and springs are disclosed in the specification as a part of such mechanism, they may be understood as forming a part of the device, not for the purpose of establishing novelty, but for making it workable.

Claims 5, 6 and 7, do not enumerate lugs as an element, either as extending horizontally across the pocket or as extending horizontally into the plane of the vertical lines of the interior faces of the yoke, but, as the followers disclosed in the specification are rectangular in shape, and, according to the claims, are arranged between the sides of a horizontal yoke, the device of the claims calls for horizontal lugs in order to be operative, and the specification discloses such lugs. The language of all these claims shows that the yoke is positioned horizontally.

Claim 5 provides for the removal of the springs and followers independently of the drawbar, but claims 6 and 7 do not, except as the construction called for is such as will permit it. The distinctive feature of claim 6 is that a detachable cover is provided for closing the pocket; and of claim 7, is a key extending horizontally through the drawbar, yoke and slots in the walls of the pocket.

In August, 1913, the defendant entered into an agreement with the Pressed Steel Car Company to furnish cheek-plates and spacer-blocks of a special design for installation by the car company on Boston & Maine cars, and, subsequently, furnished such parts with the intention that they should be assembled with other parts in such a way as would, according to the plaintiffs' contention, make up the combination of the patent in suit.

The construction of the alleged infringing device is disclosed in the answers of the defendant to certain interrogatories, and is spoken of as the machine of the interrogatories; and the question is whether the device thus disclosed infringes the patent in suit.

In the District Court it was held, with regard to claims 1, 2, 8 and 10, that every element in the claims was old and that the combination was anticipated; that claims 3, 5, 6 and 7 related to an integral box or pocket open at the bottom and were limited to that structure; that all the other elements enumerated in these claims were old, the integral pocket being the only new thing and the sole advance which Byers made in the art; and that the invention thus limited was not infringed by the device of the interrogatories, as it did not have the integral pocket of claims 3, 5, 6 and 7, but employed cheek-plates.

Was the District Court right in holding that claims 1, 2 and 10 were anticipated? The defendant says that he was; that the language of the claims—"followers * * * arranged between the arms of the yoke," "followers * * * contained between the ends of the yoke," and "a yoke between the sides of which * * * followers are set"—cannot properly be construed to mean "followers being wholly contained within the space bounded by the inner vertical faces of said yoke."

As heretofore pointed out, the follower-plates of the plaintiffs' device are described in the specification as rectangular in shape, as placed between the sides of the yoke, and as being removable from below by being "pried out by means of a tool applied to toothed recesses 10, formed in the edges of the follower-plates." The claims do not specifically state the shape of the followers; they do, however, state that they possess the quality of being "removable from below, independently of the drawbar, substantially as described," which, according to the specification, means that they may be removed "in a vertical direction without the necessity of disengaging the yoke from the drawbar" and be pried down by means of a tool applied to toothed recesses in the edges of the follower-plates. To be capable of being thus removed, the vertical edges of the followers must be straight throughout their length, and, as the claims disclose that the followers are "contained between," "arranged between," or "set between" the ends, arms or sides of the yoke, the fair inference is that the followers called for by these claims, as well as by the specification, are rectangular in shape.

The question then is, whether these claims for a draft-rigging having in combination with the drawbar a horizontal yoke, springs vertically arranged within the yoke, and followers rectangular in shape set or contained between the sides or arms of the yoke, the springs and followers being removable from below, independently of the drawbar, are anticipated, and, if not, are infringed by the device of the interrogatories.

The devices of the prior art which have been called to our attention fail to disclose such a combination, and we regard the combination as novel and the prima facie evidence of invention, due to the issuing of the patent, as not overcome.

In the patent granted to Frost (No. 232,272, January 8, 1895), the device contemplates the use of a single spring, and the followers, instead of being rectangular in shape, have arms extending horizontally above and below the yoke. They could not be removed by prying them directly down, without first removing the spring or springs, as in Byers'. It would be necessary to first remove the spring, then turn the followers to a position in which their arms would be lengthwise of the yoke before they could be removed. This surely is not the solution of the problem of free removability presented by Byers, especially when the weight of the parts and pressure of the springs are considered.

In the patent granted to Simons (No. 627,540, June 27, 1899), the yoke is arranged vertically, not horizontally, and the springs and followers are set horizontally and are removable from the side and not the bottom.

In Pilcher (No. 616,965, January 3, 1899), the yoke is horizontal, and the arms of the yoke extend through holes in the followers, thereby preventing their removal without disconnecting the yoke from the drawbar.

In Reagan (No. 491,785, February 14, 1893), and Miner (No. 570,038, October 27, 1896), the yoke is placed vertically, and to remove the springs and followers the yoke has to be disconnected from the drawbar or taken apart.

[2] While we regard these claims as valid, we are of the opinion that the defendant does not infringe any of them, as it does not furnish any element that enters into them. Thomson-Houston Electric Co. v. Ohio Brass Co., 80 Fed. 712, 26 C. C. A. 107; Leeds & Catlin Co. v. Victor, 213 U. S. 325, 29 Sup. Ct. 503, 53 L. Ed. 816.

Claim 8 is limited to followers with stop projections used in connection with two springs, and the followers and springs are to be used in connection with a horizontal yoke or some other drawbar attachment. A follower device with a stop projection was old as shown in the patent granted to Hinson (No. 635,322, October 24, 1899). This claim is not only anticipated by the prior art, but is not infringed, as the defendant does not provide followers with projecting stops.

It does not seem to us, however, that the District Court was right in holding that claims 3, 5, 6 and 7 were limited to an integral pocket. Nothing is said in these claims about the pocket being integral or a distinct entity, while in claim 9, which is not in issue, such an intention is plainly manifested. Moreover, the specification shows that the patentee's conception was not limited to an integral pocket, for he there states that "the pocket *may be* cast in a single piece." When the housing is not integral, the parts, on being assembled upon the car, form a pocket. The parts are nothing more than the cheek-castings of the prior art, with the single exception that the lugs or bearings for the followers, instead of being arranged vertically, as in the old cheek-plates, are projected horizontally across or into the vertical lines of the plane of the yoke.

In the earlier devices of the draft-rigging art, the followers were arranged horizontally rather than vertically and the ends of the fol-

lowers engaged the vertical lugs of the old check-plates. During the period covered by the Frost and Pilcher patents, when the method was introduced of placing the followers vertically, it became necessary, in order to avail themselves of the vertical lugs of the old check-plates, to so construct the followers that their sides would extend horizontally and engage the vertical lugs, but Byers conceived the idea of projecting the lugs horizontally to engage the followers, thus doing away with the horizontally-projecting arms of the followers of the Frost device. By so doing, he was enabled to make his construction stronger and render the removability of the springs and followers from below easier. While the followers in the Frost patent are removable from below without disengaging the yoke from the drawbar, they are not as readily or easily removed as in Byers, and the extended arms on the followers of Frost were more likely to become broken as they could not be reinforced and strengthened as could the lugs in Byers' device. Cheek-plates cast integrally and forming a pocket were old in the art, as shown in the patent granted to Perry, June 1, 1880, but the lugs in it, as in the old check-plates, were arranged vertically, not horizontally, and a guideway was formed for the ends of the followers in the cheeks of the pocket or casting by lowering or sinking the face in a limited area of each cheek, thus forming the lugs and guideway.

The defendant concedes that claims 3, 5, 6 and 7 are valid if limited to an integral pocket. It denies, however, that they are valid if not so limited; but we have held that the term "pocket" as used in these claims is not limited to an integral pocket or housing, and have shown that the housing, when not cast integrally, makes two check-plates which, when put in position on a car, form a pocket; and that the cheek-plates, when put in position and forming a pocket contain an element, namely, lugs which extend horizontally across or into the vertical lines of the plane of the yoke, and constitute stops for the followers, and that this element is not disclosed in the prior art.

The defendant claims that this element is old, and is shown in letters patent No. 693,643, granted to Emerick, February 18, 1902, the application having been made May 24, 1901. It will be seen that the application for this patent was not made until after the patent to Byers was issued. But the defendant contends that Emerick conceived and disclosed his invention in the spring or summer of 1899. The evidence, however, adduced in support of the proposition does not answer the requirements called for in cases of this character. The proof lies wholly in parole, is equivocal, and the time that has elapsed between the alleged conception and the filing of the application is of such length that it does not establish the clear conviction necessary to prove anticipation. Emerson & Norris Co. v. Simpson, 202 Fed. 747, 121 C. C. A. 113.

In the device of the interrogatories the cheek-plates furnished by the defendant contain lugs which extend horizontally into the plane of the vertical lines of the yoke, and constitute stops or bearings for the followers in the upper and lower portions of the pocket when the parts are assembled. The guideways for the yoke, which are disclosed

in the Byers' patent, are present in the cheek-plates of this device. They are made, not merely by cutting away the central portions of the vertical lugs of the old cheek-plates, but by cutting below the face of the plates, thereby converting the remaining portions of what were previously vertical lugs into horizontal lugs projecting across or into the plane of the vertical lines of the yoke, when the parts are assembled, and manifest a clear intention to adopt the construction of the Byers' device. We are, therefore, of the opinion that in so doing, the defendant infringes claim 3, and this is so, notwithstanding the horizontal lugs of the infringing device do not extend entirely across the pocket. The idea of horizontally projecting lugs was new with Byers. In his commercial device he does not construct the lugs so that they extend entirely across the pocket, and being the first to conceive a device of this character, we think that he is entitled, as a reasonable equivalent, to the exclusive use of such a lug, although it does not extend entirely across the pocket.

Claims 5 and 6 do not include lugs as a part of the combinations. They do, however, specify a pocket and followers arranged between the arms of a horizontal yoke within the pocket and provide for free removability from below. As these claims contemplate followers rectangular in shape included entirely within the vertical lines of the yoke, with free removability from below, the same as claims 1, 2 and 10 do, the combination presented is novel for the reasons stated with reference to those claims. And, as the parts forming the pocket when it is not cast integrally are nothing but cheek-plates, and the defendant furnishes cheek-plates for the device of the interrogatories, it infringes the combination of these claims.

In claim 7, the only distinctive feature is the key extending horizontally through corresponding slots in the pocket, yoke and drawbar. Whether this is a novel feature in plaintiffs' device, it is unnecessary to determine, as the cheek-plates furnished by the defendant in the device of the interrogatories do not infringe the claim, the slot in the cheek-plates being of an entirely different character, and in no way adapted to serve the purpose of holding the drawbar in position in case the yoke should break.

We regard claims 3, 5 and 6 as valid and infringed.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to enjoin the defendant from further constructing or selling the stop-pieces and cheek-plates referred to in the interrogatories made a part of the record in this case, for an accounting, and for costs in the District Court and on this appeal.