HIDE-ITE LEATHER CO. et al. v. FIBER PRODUCTS CO.

SAME v. WATERPROOF LEATHERBOARD CO.

(District Court, D. Massachusetts. January 30, 1915.)

Nos. 291, 329.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—WATERPROOF LEATHERBOARD.

The Buffum & Carter patent, No. 965,152, for waterproof leatherboard, and process of making same from a pulp mixture containing fibers of tanned leather, with or without fibers of other materials, *held* not anticipated nor invalid for prior use, but to disclose a patentable invention and cover a meritorious product, as evidenced by its increasing commercial success. Also *held* infringed, both as to the process and product claims.

In Equity. Two suits by the Hide-ite Leather Company and others against the Fiber Products Company and the Waterproof Leatherboard Company, respectively. On final hearing. Decrees for complainants.

Fish, Richardson, Herrick & Neave, of Boston, Mass., for complainants.

Isaac B. Owens, of New York City, and Jacobs & Jacobs, of Boston, Mass., for defendants.

DODGE, Circuit Judge. The plaintiffs, as exclusive licensee under and owner of United States patent 965,152, issued July 26, 1910, to Buffum & Carter, complain of its infringement by both the above defendants. The separate suits against them have been consolidated.

The patent is for improvements in waterproof leatherboard and processes of preparing the same. It states that it uses the term "leatherboard" to denote—

"a product made from a pulp material or mixture containing fibers of tanned leather, whether said material is composed of leather fibers only, or whether it is made up in part from such fibers and in part from fibers of other materials suitable for the purpose."

The patent has five claims. Four only are said to be infringed, viz., Nos. 1, 2, 3, and 5. The first three cover the patentees' described process. No. 5 is for waterproof leatherboard produced by the same process.

The alleged infringement by the defendant Fiber Products Company, a corporation organized in 1907, was at its factory in South

Framingham, Mass., and during the period between the issue of the patent on July 26, 1910, and May 5, 1911, on which date its manufacture of leatherboard was stopped by foreclosure of a mortgage on its machinery. The plaintiffs' bill against it was filed November 27, 1911.

It was succeeded by the defendant Waterproof Leatherboard Company, which began operations in the same factory in the latter part of September, 1911, and is alleged to have infringed the claims in suit by the manufacture of leatherboard there carried on from that time until the filing of the plaintiffs' bill against it on March 27, 1912, and subsequently thereto.

The evidence shows the operations of both companies to have been under the same control.

According to the disclosure of the patent, the patentees' process is to be applied to "a pulp mixture containing fibers of tanned leather." It is carried on at first in a "beater," wherein the pulp mixture is "ground in the usual manner until it attains the desired degree of fineness." It is stated to consist in: (1) Adding an "alkaline substance such as" certain specified substances, which are stated to produce results then described; (2) mixing with the mixture produced as above a solution of soap; what is included under this term being then stated, and so operating upon the mixture thus produced as to distribute the soap equally upon the fibers; (3) then adding a precipitant which will so react with the soap as to form an insoluble compound by union of the fatty acids with the base of the precipitant, and deposit the insoluble precipitate upon the fibers. After further mixing in the "beater," the pulp mixture is to be formed into sheets or other articles as usual.

I consider it proved that the defendant Fiber Products Company made waterproof leatherboard by this process and sold what it thus produced in considerable quantities during the period between June, 1910, and May 5, 1911. The testimony of the chemist employed by this defendant from June, 1910, to April, 1911, called as a witness by the plaintiffs, I think sufficient for this conclusion, and I do not find it met by any testimony on the defendant's behalf amounting to contradiction of it, or to direct and frank disclosure of the process in fact used. It further appears that Reynolds, superintendent and general manager first of the Fiber Products Company, afterwards of its successor, Waterproof Leatherboard Company, had, according to statements made by him to the president of the Hide-ite Company, secretly gained admission by night, at some time between November, 1908, and June, 1909, to the Hide-ite Company's factory, and thus obtained knowledge of all that was being done by that company. The patented process was then being used there. The application for the patent had been filed on January 29, 1909, and was then pending. According to the defendant's evidence, the Fiber Products Company was then and had for some time been experimenting with the object of discovering some satisfactory process for making waterproof leatherboard. One such experiment in November, 1908, is hereinafter considered. It is not unreasonable to suppose that Reynolds, having thus obtained knowledge of the patented process, proceeded to put it into use for the Fiber Company's benefit. The fact of its use under his direction as

superintendent being shown as above, I see no reason to doubt that the plaintiffs are entitled to a decree against the defendant Fiber Products Company on all the claims in suit, if the patent is valid.

The validity of the patent is attacked on various grounds which it will be convenient to consider before inquiring whether or not there is sufficient proof that the Waterproof Company has infringed it since May 5, 1911.

The Hide-ite Company, as is not disputed, had abandoned the use of the patented process before either bill against these defendants was filed, and now produces its waterproof leatherboard by means of a wholly different process, the nature of which is not further disclosed. This fact is relied on as tending to show that the process has no commercial merit. But the evidence leaves no doubt in my mind that the process was successfully used at Brockton by this plaintiff, just as the patent describes it, from February 1, 1908, to May, 1909, during which period nearly 1000 tons of waterproof leatherboard were produced and sold, of a quality such as obtained for it marked and increasing commercial success. The plaintiff's reason for discontinuing the process in May, 1909, I find to have been, not any dissatisfaction with it, but the fact that the discharge of its waste products into a stream in Brockton involved controversy with the local authorities, to be avoided only by purifying the effluent water at an expense to be avoided if possible.

The admitted fact that the plaintiff's sheets of leatherboard, said to be waterproofed as above, were passed, after drying, first through melted parafine and then through heated calendar rolls, is relied on as showing that their waterproof quality was really obtained by the above final step in their manufacture rather than by the patented process. But I think it sufficiently shown that any addition to their water-resisting power thus obtained was insignificant in comparison to the waterproofing throughout the fabric effected by the patented process. It appears that the parafine added, instead of penetrating through the sheet, went only about one thirty-second of an inch below its surface; also that it was used to produce a better finish and secure a smoother edge upon whatever might be cut from or died out of the sheet, these being the only results from its use of any consequence. Nothing appears regarding its use which I can regard as tending to show want of merit in the process of the patent.

The defendants contend that certain prior patents and the alleged prior use of certain processes claimed to be in substance the same, show want of novelty in the process patented.

The prior patents first relied on are British patents to Hardy (1875) and Minns (1878), both for "artificial leather." Both purport to be for an invention by Minns. His patent purports to be for an improvement over the process described in Hardy's patent, wherein nothing is said about waterproofing. After stating that the artificial leather produced will be far superior to that produced by Hardy's method, the Minns patent adds that it "will also be waterproof."

The Hardy product is to be made from manila, jute, and leather scraps. The manila and jute are to be boiled with lime to extract

grease. The leather scraps, "partly ground," are mixed with the boiled manila and jute, also with tan and logwood, also previously boiled. To the mixture, when sufficiently ground, rosin size and soda ash are added. The soda ash is said to render the rosin size soluble in order to allow it to mix with the pulp. Alum is next added, which is said to unite with the alkaline rosin compound and precipitate the insoluble rosin on the fiber. But, except as artificial leather generally may be expected to have water-resisting qualities, there is no hint that any feature of the process has or is intended to have the effect of waterproofing the product.

Minns adds buffalo hide or scraps thereof to Hardy's manila, jute, and leather scraps; and, having made his artificial leather out of them by following Hardy's process, he charges it with rosin, beeswax, and parafine oil mixed in specified proportions. This last mixture appears to be what is relied on for waterproofing his product. His patent goes on to describe apparatus which will be found effective in carrying out his invention. In this apparatus the leather scraps, reduced to "shavings," are subjected to the action of a solution of common soda in water, after which they are drained and washed with clean water to remove the soda solution. All this, it is said, will partially pulp the leather, which is next put into the ordinary beating engine with the manila, jute, etc., and the whole brought to the state required for subjecting it to Hardy's process. There is no hint that his use of the soda solution has anything to do with waterproofing. It is only said that a long process of soaking is thereby avoided.

For the following reasons, I cannot regard either of these patents as anticipations of the invention described in the patent in suit:

It is doubtful whether the disclosures made in them could, in any event, be considered sufficiently full, clear, and exact to permit their being so regarded for any purpose. Tan or tan liquor and logwood are ingredients of Hardy's pulp mixture. Why or in what proportions does not appear, nor why Minns uses also buffalo hide or scraps. As to the proportions in which the rosin size and soda ash, or the subsequent alum, are to be used, nothing is disclosed, nor anything regarding the time during which the pulp is to be treated with either.

There is nothing to show that waterproof artificial leather, still less waterproof leatherboard, ever was or can be made by following only the directions given in the patents.

One result of the alkaline treatment forming step (1) of the patented process is stated in the patent to be neutralization of the tannic or chromic acid in the leather fibers. It is stated that these are converted into soluble salts, and the premature precipitation of the waterproofing compound thereby prevented. The proportion of soda ash required for this purpose is stated. The proper quantity of soap to be used for step (2) of the process is also stated, and the relative quantity of precipitant to be used in the succeeding step (3). There are also statements of the proper time during which treatment of the pulp mixture by each of the above should continue. Nothing of all this is found in either British patent mentioned, and the use of tan or tan liquor as an ingredient of the pulp mixture, with the provision for washing out all

soda solution therefrom in the Minns apparatus, prevents the conclusion that either includes the use of alkali or soda ash made by the patentee. It cannot fairly be said from anything disclosed in either that the idea of making waterproof leatherboard by depositing insoluble precipitates upon its leather fibers in the beater, before forming the pulp mixture into sheets, is involved.

I do not find in any of the other prior patents relied upon by the defendants any nearer approach to the process described in these two patents, and if the above conclusion regarding them is right, no necessity appears for discussing the others in detail.

Taking the alleged prior uses upon which the defendants rely in the order of time, the first is said to have been between 1881 and 1885 at the Dawson factory in Lawrence, Mass., and the second at the factory of the Milton Leatherboard Company, at Milton, N. H., in 1893, and subsequently. The evidence relied on to show both is the testimony of Frank E. Norton, manager of a leatherboard factory in Canada, taken in surrebuttal in November, 1913. He states that from 1881 to 1885 he worked at the Dawson factory in various positions, and that later he worked for some years, beginning in 1893, for the Milton Company. He describes the process whereby "counterboard" was made while he was at Lawrence, and the process whereby "shankboard" was made at Milton.

As to both processes, Norton's testimony was based only upon his memory, and was not supported by anything whatever in the nature of concrete, visible, cotemporaneous proofs, speaking for themselves. Under the circumstances, it would be, in any case, impossible to accept it as establishing anticipation, consistently with what has been declared by the Court of Appeals for this Circuit to be the underlying rule in such cases. Emerson, etc., Co. v. Simpson Bros. Corp., 202 Fed. 747, 750, 121 C. C. A. 113. And without applying the rule referred to, I am also unable to believe that his description of either of the above processes sufficiently shows any employment of the patented process in either manufacture he describes. As to the "shankboard" said to have been made from a pulp mixture containing 70 per cent. of leather fiber, all that his testimony shows is that 10 pounds of lime and 7–10 pounds of soda ash were added to it in the "beater," the lime being sometimes omitted and sometimes the soda, but never both. As to the "counterboard," there was in the pulp mixture, according to Norton, only 3 per cent. of leather fiber, the remainder being composed of wood pulp or other vegetable fiber, to which was added "a certain number of pails of rosin size and a certain amount of alum and a certain number of pounds of venetian red." If, as he says or seems to imply, the rosin size was used for waterproofing the pulp mixture and the alum for setting the color and the rosin in the fiber, nothing more is shown than that it was not new with the patentee to add rosin size and alum to pulp mixtures in general, as in the Hardy and Minns patents. Norton's crude description affords no indication of any such adaptation of their use to the thorough waterproofing of the leather fiber contained in such mixtures, as it was the declared object of the patent in suit to accomplish.

What appears regarding the other alleged prior use is as follows:
A letter dated November 19, 1908, from the Arabol Manufacturing
Company, a New York manufacturer of rosin size and other sizes,
acknowledges the receipt from the defendant Fiber Products Com-
pany of a keg of beaten leather scrap, and promises further advice
about it "as soon as we receive a report from our laboratory." A sub-
sequent letter, dated December 4, 1908, to the same defendant from the
Arabol Company, signed by "E. Weingartner, President" (marked "De-
fendant's Exhibit Arabol Manufacturing Company Report"), stated
that:

"Our laboratory reports that your stock is so acid that the size may be
precipitated as soon as added, that is, before it could be evenly distributed
in the stock."

Advice how to overcome this follows. The defendants contend
that the suggestions made set forth, in substance, the process of the
patent, and they claim to have shown that the Fiber Products Company
followed the suggestion, and by doing so produced waterproof leather-
board during the first week of December, 1908. The application for
the patent in suit was on January 29, 1909. The defendants say that
it was thus anticipated by the Fiber Products Company, and further
that, Weingartner having been thus able to put the process of the pat-
ent on paper, offhand and with no other motive than to assist the sale
of his rosin size, the patentee cannot be credited with any invention in
respect thereof.

Weingartner's suggestions were made for the purpose of showing
how premature precipitation of the waterproofing elements, due to acid
in the pulp mixture, might be prevented, and this, as appears from
the patent, is one of the results which the patentees claim to accom-
plish. What he suggested, in substance, was, first to neutralize the
stock with caustic soda lye, then to add the size, and finally to neutral-
ize with sulphate of alumina, or with part sulphate of alumina and
part sulphuric acid, in place whereof a solution of alum in water might
be used, though the acid was stated to be preferred. The quantity
of alum required "to set the rosin size" is indicated, and there are
further suggestions as to details. What he suggested, though including
the neutralization of acid in the pulp mixture, by means of an alka-
line substance, and also the use of alum to precipitate rosin size, seems
to me to cover only some of the rudimentary ideas of the patented pro-
cess, and to stop far short of the developed process. If it be true that
the Fiber Products Company made leatherboard according to these
suggestions, and that it was to any extent waterproof, the evidence
fails to show that it compared in quality with the patentees' product,
or even that it was capable of commercial success. The sample pro-
duced, and the admission of the defendants' witnesses that it was "too
hard and brittle to be suitable for the trade it was intended for," and
that "the stock seemed burnt," indicate that the attempt to manufacture
according to these suggestions resulted only in failure. It does not
appear to have been tried again. I am unable to regard what is shown
concerning it as establishing anticipation.

No sufficient ground for denying validity to the patent appearing, I

next consider whether infringement by the Waterproof Leatherboard Company is proved. If there was such infringement, it must have been after that concern began making leatherboard in September, 1911, and, in order to be dealt with in this case, it must have begun before the second of the above bills was filed on March 27, 1912.

Edwin B. and Harry Eising owned substantially all the Waterproof Company stock, were its officers, and controlled it as they had controlled the Fiber Products Company, whereof they were also officers. They organized both companies, and held a mortgage on the machinery of the company last mentioned, which they foreclosed, as stated, in May, 1911. They employed C. R. Reynolds as general manager and superintendent, first of the Fiber Products Company, afterward of the Waterproof Company, as above stated.

According to their testimony, the Waterproof Company, from the beginning of its operations in September, 1911, followed the process, said to have been evolved from numerous experiments carried on during the previous operations of the Fiber Products Company, of washing the pulp mixture in a "beater" with water only, until the tannic acid and the tannates in the leather fiber had been washed out, after which the waterproofing emulsion (composed of soap, etc.) was added, the beating continued until this was thoroughly mixed with the fiber, and finally alum was added as a precipitant, in quantity sufficient to precipitate the soap and waxes on the fiber. Then followed the forming of the contents of the "beater" into sheets.

This was the process of the patent, save that for the first step thereof, viz., the addition of an alkaline substance, said in the patent to produce certain results, among them neutralization of the tannic or chromic acids in the pulp mixture, there was substituted the removal of such acids, unneutralized, by washing only. The defendants contend that the process described as above does not infringe claims 1, 2, or 3 of the patent, in each of which a preliminary alkaline treatment is specified.

Claim 3 requires specifically that the pulp mixture be rendered receptive to the waterproofing agents, "by means of alkaline reagents adapted to combine with the acid derived from the leather to form soluble compounds thereof," and the plaintiffs do not insist that the washing-out process infringed it. But they insist that claims 1 and 2, which require only that the mixture be rendered receptive, etc., "by an alkaline treatment," were infringed, because washing is a well-known equivalent for "alkaline treatment" as a method of getting rid of the acids referred to in such pulp mixtures.

Upon the question thus raised, I am obliged to agree with the defendants. I am unable, in view of what appears, to regard washing with water and alkaline treatment as equivalents, each well known as a proper substitute for the other. If it be true that there is no difference in the result accomplished, it cannot be said that there is substantial identity in the mode of operation by which the result is reached. There is some reason to believe that the washing process may render the leather fiber more receptive to the subsequent waterproofing process than does the alkaline treatment, and is so far superior to it.

At any rate it takes more time, and the acids are not chemically combined in order to remove them. Having limited themselves to a mode of freeing the fiber from its acids which involves chemical action, I do not think the patentees can justly claim, as covered by their patented process, a method which dispenses with chemical action so far as this step is concerned.

The plaintiffs contend that, in any event, the product of the process above described infringed claim 5 of the patent, which is for—

"a waterproof leatherboard made from pulp, containing disintegrated fibers of tanned leather and having insoluble waterproofing compounds deposited by precipitation upon and thereby intimately mixed with the fibers of which it is composed, substantially as described."

It is expressly stated in the patent that the invention "includes the product resulting from the process described as well as the process itself," and I do not think, in view of what appears, that claim 5 can be construed broadly enough to sustain this contention. I must regard the product covered by claim 5 as including only such waterproof leatherboard as has been produced by the process of the patent or its equivalent. Downes v. Teter-Heany, etc., Co., 150 Fed. 122, 80 C. C. A. 76. So far, therefore, as the Waterproof Company followed only the process described by its witnesses as above, I hold that it did not infringe any of the claims of the patent.

Upon the evidence, however, I think the plaintiffs have sufficiently shown that the "washing-out process" was not in fact the only one followed by the Waterproof Company in making the leatherboard it produced subsequently to September, 1911.

The testimony of Edwin B. Eising, vice president of the company and in full charge of its affairs, was, at most, that no other methods were used "in a commercial way," or not "regularly as a commercial proposition," at least with his knowledge and consent. He admitted that perhaps the alkaline treatment was used "in an experimental way." But this is contradicted by the plaintiffs' witness Parsons, a competent and experienced observer, employed in the Waterproof Company's factory as beater foreman from February 8, 1912, to January 23, 1913. Parsons' testimony is direct and positive to the effect that sodium carbonate, either as soda ash, monohydrate, or sal soda, were regularly used in the beaters, in quantity amounting to 1½ per cent. during the period from February 8th until some time in the following April, when washers were installed; that after the installation of the washers the use of alkali was for a time discontinued, but resumed later, so that in the following August the alkali was again regularly put into the beaters after their contents had been washed. This was done, according to Parsons, by Lemoine, the company's chemist, under the direction of Reynolds, its superintendent.

Parsons, while at the defendant's factory, was, as he himself states, a detective sent there by the plaintiffs and acting for them, but there is no such contradiction of his statements as might have been expected if they were not true. The defendant has not called Reynolds or Lemoine, nor has it excused or explained the absence of any testimony from either of them. Lemoine, as is not denied, sent daily to the de-

fendant's New York office written reports of all the chemicals used in the beaters, but the defendant has refused to produce any of these reports. There is proof of declarations by Reynolds, in December, 1911, that soda ash was among the materials they were using and discharging into a neighboring brook. There is uncontradicted evidence showing regular purchases of sal soda in large quantities between December, 1911, and March, 1912. These, with other circumstances, tend to confirm Parsons' testimony; nor does it seem to me that he can be regarded as discredited by any of the evidence upon which the defendants rely for that purpose in view of their failure to meet his testimony by direct contradiction as above.

Parsons' testimony further satisfies me that there was a regular use by the Waterproof Company of borax as an ingredient of its waterproofing emulsion, in quantity sufficient to make such use an infringement of the patent, wherein it is expressly provided that, if desired, the neutralizing alkali employed may be mixed with the soap. The only conflict upon this point between Parsons' testimony and that of Eising is as to the quantity of borax used. Eising's statements regarding this matter I am unable to regard as sufficiently direct and consistent to be accepted as against those of Parsons without confirmation; and here, as before, that confirmation which might have been expected from the defendant is wanting.

In my opinion, therefore, the plaintiffs have proved that the Waterproof Leatherboard Company used the "alkaline treatment" of the patent as one step of the process whereby they made leatherboard; the other steps being, as appears from their own testimony, those of the patented process. I find therefore that there has been infringement by that company of all the claims of the patent.

In reaching the above conclusions, I have taken the plaintiffs' view that prior methods of sizing or waterproofing vegetable fiber in the manufacture of paper are immaterial upon the question of the validity of the patent, and that we are concerned only with methods of treating leather fiber in the manufacture of leatherboard. Whether or not one of the results of the patentees' "alkaline treatment" is to restore the original colloidal character of the leather fiber substance treated, as stated in the patent, I have not thought it necessary to inquire. There being no question as to its effect in neutralizing and converting the acids referred to into soluble salts, I see no occasion for determining whether or not the belief of the patentees, expressed in their specification, that it also renders the leather fibers more receptive to the action of the waterproofing agents in the manner stated is or is not shown to be a correct belief.

I hold the patent valid, not anticipated, and infringed as to all the four claims in suit, by both defendants. A decree may be entered accordingly.