## LIONNE CO. v. CUSHMAN-HOLLIS CO.

(District Court, D. Maine, S. D. May 29, 1924.)

No. 823.

1. Patents ⬦328—1,339,462, for process of protecting shoes from soiling during manufacture, held void for want of invention and prior use.

The Lionne patent, No. 1,339,462, for process of protecting shoes from soiling during manufacture, *held* void for want of invention, being in effect for the application of "white dope," long in use for the purpose, to white shoes, to protect them from soiling during manufacture by means of an air brush, also old in use for similar purposes, instead of by an ordinary brush or sponge; also *held* void for prior use by others.

2. Patents ⬦27(1)—Application of old process to new subject, without change of function, is not invention.

The application of an old process to a new use or subject, without any substantial change of function, and in a way which would be obvious to any mechanic, is not patentable invention.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Lionne Company against the Cushman-Hollis Company. Decree for defendant.

Roberts, Roberts & Cushman, of Boston, Mass., for plaintiff.

Emery, Booth, Janney & Varney, of Boston, Mass. (Ellis Spear, Jr., of Boston, Mass., of counsel), for defendant.

PETERS, District Judge. This is a bill in equity, charging infringement of a patent, and seeking an injunction, an accounting, and damages. The patent, No. 1,339,462, was granted by the Patent Office May 11, 1920, on an application filed by one Ernest Lionne July 5, 1918. The title of the plaintiff corporation is admitted. The alleged invention is a process of protecting shoes from soiling during manufacture. At the trial the plaintiff relied on claims 1 and 12.

[1] Claim 12 is stated by counsel for the plaintiff to be the process, and claim 1 its expression in an article of manufacture.

Claim 12: The method of temporarily protecting the surface of an article, which consists in applying a "thick, viscous fluid composition" in a finely divided state to the surface to be protected, to produce thereon a layer of dense formation, drying said layer, and subsequently removing said layer in fragments."

Claim 1: "A shoe having protecting means for its surface consisting of a layer of material formed on the article of substantially uniform thickness and great density and composed of finely divided particles forcibly compacted together and to the surface and adhesively secured together and to the surface, and conforming to all irregularities in the surface, said layer being strong and durable to withstand manipulation, and friable to admit of its being removed in fragments by mechanical means."

Paraphrased and applied to this case, the process is one of protecting white shoes from being soiled during manufacture by coating them with a liquid composition, which will cover with substantial uniformity all parts of the upper of the shoe, of sufficient thickness for protection, sufficiently compact and so put on as to stay on until the shoe is finished, of flexibility to permit manipulation, and of such a character that it can be brushed off in dry fragments when the shoe is finished.

The liquid composition to be used as the coating is referred to in claim 12 as being "a thick, viscous fluid." The liquid in practical use seems to be much thinner than could be properly described as thick and viscous; also, the ingredients of a typical example of the composition, given in the specification, consisting of clay, gum, oil, and water in the proportions stated, make a composition with admittedly ten times too much gum for a workable material, and some defenses to this bill are based on these facts; but I have not found it necessary to consider them, as more substantial defenses, directed definitely to the merits, are, in my opinion, controlling.

## I.

Clearly, for a suitable protective covering, three things are necessary: (1) Adequate protection of the upper from dirt and stain while going through the factory; (2) capacity to stay on without unduly hampering the operations of manufacture; and (3) removability at the finish without injury to the shoe.

In the language of the plaintiff's counsel in his comprehensive brief, referring to the above requisites, under five heads, instead of three:

"These characteristics provide the requisite *insurance against soiling* which is, in a word, the object of the invention."

At the outset it is important to review the state of the art prior to Lionne. It appears that two kinds of protective coverings were in use in the shoe manufacturing business: (1) Cloth and paper coverings, loose except where fastened between the sole and upper, to be finally cut off at the sole; and (2) a liquid mixture, similar to that referred to, though not accurately described, in the specification, being the same, or substantially the same, first bought by the plaintiff in the open market, and later prepared by it and sold to the trade; the same used by the defendant and many other shoe manufacturers for years before Lionne, and, by stipulation in this case, continuously sold by manufacturers of shoe factory supplies to their customers in the usual course of business, without any claim of patent or restriction in its use, under the name of "white dope," and consisting, as mentioned, of a mixture of clay, gum, oil, and water in proportions best adapted to adhere to the shoe and forming a temporary protective coating or covering therefor. This "white dope," about the appearance and consistency of paint, was, before Lionne, commonly applied with a brush or sponge. The clay paint or dope thus applied, when properly applied, answered in a practical way the three requirements of protecting the shoe during manufacture, sticking on without being troublesome, and coming off at the end.

Lionne, in his application, suggested the use of an atomizer or air brush, instead of a hand brush, to throw the dope on the shoe. The air brush, however, and its use in throwing paint, whitewash, and other surfacing liquids on surfaces generally, were admitted to be old prior to Lionne. It is stipulated that air brushes had been—

"increasingly developed and in increasing use for some ten years, * * * and had, theretofore, been used to apply coatings such as whitewash and paint and various other materials, and specifically had it been used for the application of finish to leather and flexible coatings to cloth and by shoe manufacturers to apply stain and finishing coatings to the edges and bottoms of soles and to the heels of shoes."

Brushes of different kinds were used in removing the dried dope from the shoe, and that process is admittedly old, and no patent is claimed for it or for the brushes.

It being admitted that the invention is not, singly, the material or "dope" itself, nor its use as a protective coating, nor the air brush, nor the use of the air brush, nor the use of the rotary brush for removal, all of which are old, the field of invention is limited to some combination of these factors producing a new and useful result, not obvious to a person skilled in the art.

This brings us to the inquiry as to what new combination of old elements is claimed by the plaintiff, and what are the results.

The alleged new combination is the putting on of the "white dope" by air brush.

Quoting from the plaintiff's brief:

"The characteristic feature of the application of 'white dope,' according to Lionne's patented process, is the application of force, as by applying it with an atomizing device or air brush, under an air pressure, say of 75 pounds. In the case at bar Lionne was the first to apply a 'white dope' protective covering by air brush to any object."

What new and useful result follows? Continuing the first-mentioned quotation from the plaintiff's brief:

"The finely divided particles are driven into the voids and 'become imbedded therein and are thus forcibly compacted together and to the article, as well as adhesively secured together and to the article, and as a result the layer which is formed on the article is of great density and considerable tenacity and durability, which, when dry and hard, may be more or less roughly handled and manipulated' etc. Lionne patent, p. 3, lines 84–110. And, in spite of its thickness, density, tenacity, and adhesive intimacy with the shoe, the coating, when dried, is sufficiency friable to be removed in fragments after its use as a protector, by such simple means as a rotary brush. Lionne patent, p. 3, lines 111–115."

But substantially the same result followed the use of the "white dope" when put on with a sponge or hand brush.

The fact is, Lionne, from the beginning of his contact with the Patent Office to the conclusion of the exhaustive brief filed by counsel for plaintiff after the trial, has either ignored or adopted as his own the entire result of this application of the old "white dope" by hand.

In explaining the state of the prior art, in his application, Lionne said:

"Heretofore coverings of different materials have been employed for this purpose (protecting shoes during manufacture), as paper, cloth, rubberized cloth, and oilcloth."

The Patent Office might well have believed that the use of a liquid, paintlike protective coating was original with the applicant, and granted the patent on that basis.

In fact, this probably accounts for the issuing of a patent, and while, perhaps, justifying the Patent Office, greatly impairs the presumption of validity relied on by the plaintiff.

The particles of the "white dope," when put on a canvas shoe with a sponge or brush, also "become imbedded therein, and are [thus] forcibly compacted together and to the article, as well as adhesively secured together and to the articles, and as a result the layer which is formed on the article is of great density and considerable tenacity and durability, and which, when dry and hard, may be more or less roughly handled and manipulated [in other words, it sticks on well], and in spite of its thickness, density, tenacity, and adhesive intimacy with the shoe, the coating when dried is sufficiently friable to be removed in fragments after its use as a protector by such simple means as a rotary brush [in other words, it comes off well]."

The plaintiff claims that the impact due to the force by which the air brush hurls the dope on the shoe is the cause of the "density," "adhesiveness," etc., which makes it stick on, since thus "the finely divided particles are driven into the voids" of the canvas.

It seems that when put on by hand the "dope" sticks well enough, but in neither case is this due so much to being forced into the interstices of the canvas by outside impact as to the superior power of capillary attraction and the adhesive ingredients of the composition.

In fact, I find no advantage in the air brush method over the hand brush method, except the obvious one of speed. The dope can be put on two or three times as fast by the air brush. All other results described with such minuteness by the plaintiff can be achieved by the hand method when sufficient care is used, and care means time.

Counsel for the plaintiff argues that the evidence shows that the air brush treatment makes a better shoe, an advantage for which his process should have credit, and emphasizes the testimony of the president of the defendant company in answer to a question of the court:

"Q. Why did you adopt this method, if it does not save any time?
"A. Why, we got a little trimmer, neater looking shoe."

Counsel overlooks the fact that the comparison of the witness must have been with the cloth covering with which he had just finished comparing the air brush method as to the cost. He did not testify that the dope put on by air brush made any better shoe than the dope put on by hand; nor could he, in view of the testimony that the reasons why the air-brushed shoe was slightly better than the one protected by cloth cover were that the liquid in the dope made the shoe conform to the last better, and there was no edge of the cloth covering left where it was cut off—reasons that apply to the dope-covered shoe, regardless of how put on.

So I conclude that the combination of old elements relied upon by the plaintiff as the basis of his patent produced no new and useful result that was not perfectly obvious to a mechanic familiar with the art, and that therefore the combination can have no better standing than its constituent parts.

[2] The conclusion must be the same if the view be taken, as contended for by the plaintiff, that the air brush does apply the dope more uniformly, compactly, and thoroughly than by hand. These features are due to the skill of the operator, combined with the natural attributes of a well-known instrument applied to a new use.

"An old process applied to a new use is not patentable, when it performs substantially the same functions." In re Braselton, 51 App. D. C. 32, 273 Fed. 761.

In the case of Fry v. Rookwood et al., 101 Fed. 723, 41 C. C. A. 634, affirming Judge Taft's decision in 90 Fed. 494, covering the use of an air brush for applying a solution of clay to pottery, Judge Lurton said:

"The gist of Miss Fry's improvement was the spraying of these slips by the use of an atomizer upon the green clay molded into the desired form. Every other step in the process which she describes was old. The application of the color to the green clay before any firing was confessedly old in the making and decorating of the pottery. *The only change claimed to have been effected was in the means by which the color was applied, to wit, by atomizing, rather than by a brush.* * * * On the whole case, *I have no doubt that* Miss Fry's *patent is void for want of invention.* Even if Walkup's patent had been limited—as it was not—to the application of pigments to canvas and paper, the art of painting on those surfaces is so nearly allied to painting or

decorating clay that it would have *involved no invention to transfer the use of the atomizer from one art to the other.*"

"The application by the patentee of an old process to a new subject, without any exercise of the inventive faculty, and without the development of any idea which can be deemed new or original," will not sustain a patent. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200.

The plaintiff stands on the position that the present case is differentiated by the fact that Lionne was the first to apply dope to any object by air brush.

If the air brush previously had been used to apply dope to various other surfaces, applying it to shoes would not be claimed as an invention. The particular object to which the application was made would not be important.

It being apparent that the air brush had been used to apply paint, whitewash, varnish, stain, and other coating liquids to surfaces generally, can it be claimed to be a discovery or exercise of the inventive faculty to use the air brush to apply a liquid called "white dope"—to all appearance a paint—to the same surfaces? If it is, then this defense fails.

Eliminating the particular object, which is not important, applying paint, whitewash, etc., by an air brush is admittedly old. I am unable to find any invention, or any new and unobvious result, in running liquid white dope through an atomizer, instead of liquid white paint; the dope being as free to use by the world as paint.

## II.

As another defense it is asserted that the patent is void for prior knowledge and use by others.

The application of Lionne was filed July 5, 1918. He did not testify as a witness, and no date of invention prior to that time was established.

Defendant claims to have shown several prior uses, among others at the factory of N. D. Dodge Company, at Newburyport, in 1916 and 1917.

This use is based upon the testimony of three witnesses, Bowsley, Gynan, and Pink, all previous employés of the Dodge Company. Bowsley operated a sprayer or air brush for the purpose of spraying a cellulose solution on tops and enameling liquid on the heels of shoes. Gynan had been using "white dope" to cover up stains on canvas shoe tops, later brushing it off. Between the two they decided to try some of the "white dope" for a protective covering, and took a sample of it to the sprayer in use by Bowsley and successfully applied the "dope." They then ordered a gallon more and sprayed more shoes. The shoes were put through the factory, but, in brushing off, the nap of the cloth was injured, so that the process was, for the time, abandoned.

There is no doubt as to what actually happened, and that the air brush, which had been previously used for applying stain to the heels and other solutions to the uppers of shoes, was, by these operatives in the Dodge factory, used to apply "white dope" to the canvas uppers as a temporary protective covering. The only disputable question is as

to the time when that occurred. Witnesses fix the time with reference to other events which are also remembered, and in part identified, and fix the date of use as between August 1 and September 1, 1916. This is attacked by the plaintiff on the ground that it rests on the unsupported oral testimony of these witnesses.

Another use is claimed by the defendant to have been proven at the factory of Thomas G. Plant Company, at Jamaica Plain, Mass. By the testimony of witnesses it appears that certain experimental uses of the air brush for spraying "white dope" on shoes were made in 1916 and in the spring of 1917 at this factory, and by reference to certain schedules used at the factory in 1917 it is proved beyond doubt, and really not disputed by the plaintiff, that in this factory the process of applying the "white dope" to shoes with the air brush was reduced to a practice as early as June, 1917.

The plaintiff, however, not disputing this use of the air brush, which began as a regular practice in June, says that it was instigated by one De Witt, vice president and agent of the plaintiff corporation, who was selling both "dope" and air brushes to the shoe trade. The plaintiff relies upon a letter of June 6, 1917, written by De Witt to the Plant Company, in which he recommends the use of various air brushes for different purposes, and recommends a certain kind of "dope," which he calls an "air-brush finish," and says, among other things:

"This air brush is not only adaptable to applying our heel finishes, but there are many other uses in the factory which it is bound to be useful in. Some of them we have experimented in already, such as applying white soil-proof materials to shoes in the lasting room, which was later brushed off in the packing room, even applying heel dressing, heel inks, edge inks, and so forth, and we feel that one of these equipments would be a good investment for your firm, and we would be glad to put one into your factory on trial."

Plaintiff says that this was a disclosure of the invention, supporting the presumption in favor of the patent, and that the Plant people, seeking a practical protection for their white shoes, "had to be taught by the plaintiff how to do it, and, when so taught, defendant continuously followed the plaintiff's teaching."

I am not satisfied with these deductions from the facts as I find them. There is no evidence that the process in question was invented by Lionne prior to April, 1918, the date of the application. Plaintiff filed, as a date of invention, April, 1917; but that was not supported by testimony of Lionne or otherwise. There is no connection shown between the inventor, Lionne, and the knowledge in the possession of the agent of the plaintiff corporation, when he was enlarging upon the usefulness and value of his merchandise. This selling agent was in touch with the superintendents of the various factories and their experiments with his goods. The letter of June 6th is as consistent with information derived by the writer from the superintendents or others in the factories, about their experiments, or his observation of them, as with a disclosure to him by Lionne. I am satisfied that there was, at least in an experimental way, in these factories, prior to April, 1917, such use of this process with air brushes as to make it incumbent on the plaintiff to show by satisfactory proof that Lionne's invention pre-

ceded the date of such use. Corbett v. Reinhardt Meding Co. (C. C.) 166 Fed. 768.

The alleged prior use at the Dodge factory is attacked on the ground that it rests on oral testimony alone, and should be rejected on the authority of Emerson & Norris Co. v. Simpson, 202 Fed. 747, 121 C. C. A. 113; but in the instant case the much shorter length of time involved and the reference by the witnesses to contemporaneous records, like newspapers, in order to fix dates, make this evidence at least of sufficient value to be considered in connection with other evidence of uses at different places at about the same time, and it is strengthened by evidence of such other uses. Double Fabric Co. v. General Tire & Rubber Co. (D. C.) 258 Fed. 932.

The experimental nature of the prior uses in the Plant factory and in the factory of the defendant, which was also the subject of testimony, cannot be doubted. I do not think, however, that it can be said that they can be properly classed as "unsuccessful and abandoned experiments," such as are referred to in Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 Sup. Ct. 118, 39 L. Ed. 153.

So far as the application of the "white dope" by air brush for protective covering was concerned, the operation was a complete success, and has been continued in substantially the same form. It was found that the brushing-off process, when the shoe was finished, slightly raised the nap in a particular kind of canvas used at that time and place, and for that reason the use of any dope covering was discontinued.

As I view the evidence, there are prior uses proved in anticipation of this patent which cannot be denied, explained, or successfully adopted by the plaintiff, and for that reason, as well as because of no invention, the case must fail.

I have not considered the evidence of other prior uses, for the reason that names and residences were not given in any 30-day written notice, as required by statute.

It was also objected by counsel for plaintiff that evidence of uses mentioned could not be properly considered for the same reason; but in those instances I find that the provisions of the statute have been sufficiently complied with to make the testimony admissible.

Other defenses have been set up by the defendant, but, except where impliedly involved in the above, I have not deemed it necessary to consider them.

My conclusion is that the bill must be dismissed, with costs.